UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| JAMES DEREK MIZE, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:19-cv-3331-MLB |
| MICHAEL R. POMPEO, et al., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................1

II.    FACTUAL AND STATUTORY BACKGROUND ...................................2

    A.    The Immigration And Nationality Act And Defendants' Policy. ........2

    B.    The Mize-Gregg Family. ...................................................4

    C.    Defendants' Refusal To Recognize S.M.-G.'s U.S. Citizenship. ........7

III.   LEGAL STANDARD ..................................................................9

IV.    ARGUMENT .........................................................................10

    A.    The Text, Structure, And Purpose Of Section 301 Make Clear
        That S.M.-G. Is A U.S. Citizen, And Has Been Since Birth. ...........11

        1.    The plain language of Section 301(c) does not require a
            child to have a biological relationship with both of her
            married parents.............................................................11

        2.    Defendants' reading of Section 301 is inconsistent with
            the design and structure of the INA. .......................................13

        3.    The INA reflects Congress's intent to keep families
            together..................................................................14

        4.    Section 301(c) must be understood against the backdrop
            of the common law spousal presumption of parentage,
            which does not hinge on biology. ...........................................15

        5.    Courts have repeatedly rejected Defendants' reading of
            Section 301................................................................18

        6.    Defendants' definitional argument is unavailing....................22

        7.    Defendants' reliance on the Roman concept of *jus
            sanguinis* is misplaced. ....................................................23

    B.    Section 301 Must Be Read To Reject Defendants' Biological
        Relationship Requirement As A Matter Of Constitutional
        Avoidance.................................................................27

        1.    The Court should employ the canon of constitutional
            avoidance to avoid addressing the serious constitutional
            questions raised by Defendants' interpretation.......................27

i

# TABLE OF CONTENTS
(continued)

**Page**

2.     Defendants' interpretation of Section 301 raises serious constitutional problems. ..........................................................29

      a.     Defendants' biological relationship requirement would run afoul of the liberty and equality principles recognized in *Windsor*, *Obergefell*, and *Pavan*. ............................................................30

      b.     Defendants' interpretation would infringe upon Plaintiffs' fundamental rights to family formation, integrity, and privacy. ....................................................32

      c.     Defendants' interpretation would raise serious equal protection concerns. .............................................34

V.     CONCLUSION ...........................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................9

*Boquet v. Boquet*,
  269 So. 3d 895 (La. Ct. App. 2019).....................................17

*Burban v. City of Neptune Beach*,
  920 F.3d 1274 (11th Cir. 2019) ...........................................28

*Cable Holdings of Ga., Inc. v. McNeil Real Estate Fund VI, Ltd.*,
  953 F.2d 600 (11th Cir. 1992) .......................................28, 29

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977)..............................................................34

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................9

*Clark v. Martinez*,
  543 U.S. 371 (2005)..............................................................28

*Custis v. United States*,
  511 U.S. 485 (1994)..............................................................19

*Dvash-Banks v. Pompeo*,
  No. 2:18-cv-00523, 2019 WL 911799 (C.D. Cal. Feb. 21, 2019).....................21

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.
  Trades Council*,
  485 U.S. 568 (1988)..............................................................28

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972)..............................................................35

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..............................................................28

*Guyer v. Smith*,
  22 Md. 239 (1864) ................................................................24

TABLE OF AUTHORITIES
(continued)

**Page**

*Hooper v. California*,
155 U.S. 648 (1895)...........................................................................27

*Hurst v. Youngelson*,
354 F. Supp. 3d 1362 (N.D. Ga. 2019)..............................................9

*In re Baby Doe*,
353 S.E.2d 877 (S.C. 1987) .......................................................17, 18

*In re Christopher YY. v. Jessica ZZ*,
159 A.D.3d 18 (N.Y. App. Div. 3d Dep't 2018)..............................17

*INS v. St. Cyr*,
533 U.S. 289 (2001).........................................................................29

*Jaen v. Sessions*,
899 F.3d 182 (2d Cir. 2018) ......................................................*passim*

*Jimenez v. Weinberger*,
417 U.S. 628 (1974).........................................................................35

*Kemper v. Equity Ins. Co.*,
396 F. Supp. 3d 1299 (N.D. Ga. 2019)..............................................9

*Kitchen v. Herbert*,
961 F. Supp. 2d 1181 (D. Utah 2013),
*aff'd on other grounds*, 755 F.3d 1193 (10th Cir. 2014) ...................37

*L.C. v. M.G.*,
430 P.3d 400 (Haw. 2018) ...............................................................17

*Latta v. Otter*,
771 F.3d 456 (9th Cir. 2014) ...........................................................37

*Lehr v. Robertson*,
463 U.S. 248 (1983).........................................................................33

*Levy v. Louisiana*,
391 U.S. 68 (1968).............................................................................8

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lofton v. Sec'y of Dep't of Children & Family Servs.*,
358 F.3d 804 (11th Cir. 2004) ..................................................36

*McLaughlin v. Jones in & for Cty. of Pima*,
401 P.3d 492 (Ariz. 2017) ......................................................17

*McMillian by McMillian v. Heckler*,
759 F.2d 1147 (4th Cir. 1985) ................................................16

*Michael H. v. Gerald D.*,
491 U.S. 110 (1989)............................................................16, 17

*Miller v. Albright*,
523 U.S. 420 (1998)........................................................2, 25, 26

*Morrissey v. United States*,
871 F.3d 1260 (11th Cir. 2017) ..............................................36

*Murphy v. Houma Well Serv.*,
413 F.2d 509 (5th Cir. 1969) ...............................................16, 17

*NLRB. v. Amax Coal Co.*,
453 U.S. 322 (1981)............................................................15, 16

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)..............................................................13

*Nation v. Esperdy*,
239 F. Supp. 531 (S.D.N.Y. 1965) .........................................14

*Neder v. United States*,
527 U.S. 1 (1999)..................................................................18

*Nguyen v. INS*,
533 U.S. 53 (2001)................................................................25

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015)..............................................30, 31, 32, 35

*Pavan v. Smith*,
137 S. Ct. 2075 (2017) ......................................................30, 31

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992)................................................................................34

*Pine v. City of West Palm Beach*,
  762 F.3d 1262 (11th Cir. 2014) ...........................................................29

*Ray v. Bryant*,
  411 F.2d 1204 (5th Cir. 1969) ..............................................................16

*Retuya v. Sec'y Dep't of Homeland Sec.*,
  412 F. App'x 185 (11th Cir. 2010) ........................................................3

*Russello v. United States*,
  464 U.S. 16 (1983)...............................................................................12

*Scales v. INS*,
  232 F.3d 1159 (9th Cir. 2000) ......................................................*passim*

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017).................................................................3, 24, 37

*SmithKline Beecham Corp. v. Abbott Labs.*,
  740 F.3d 471 (9th Cir. 2014) ...............................................................36

*Solis-Espinoza v. Gonzales*,
  401 F.3d 1090 (9th Cir. 2005) .......................................................15, 20

*Sook Young Hong v. Napolitano*,
  772 F. Supp. 2d 1270 (D. Haw. 2011).................................................15

*Stanley v. Illinois*,
  405 U.S. 645 (1972)..............................................................................33

*U.S. v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001)..............................................................................28

*United States v. Nordic Village, Inc.*,
  503 U.S. 30 (1992)................................................................................13

*United States v. Windsor*,
  570 U.S. 744 (2013)......................................................................*passim*

## TABLE OF AUTHORITIES
(continued)

**Page**

*Univ. of Tex. Sw. Med. Center v. Nassar*,
    570 U.S. 338 (2013)............................................................................13

*Waters v. Ricketts*,
    48 F. Supp. 3d 1271 (D. Neb. 2015),
    *aff'd on other grounds*, 798 F.3d 682 (8th Cir. 2015).......................37

*Weber v. Aetna Casualty & Surety Co.*,
    406 U.S. 164 (1972)....................................................................37, 38

*Wooley v. City of Baton Rouge*,
    211 F.3d 913 (5th Cir. 2000) ............................................................33

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012) .............................................................36

*Zablocki v. Redhail*,
    434 U.S. 374 (1978)..........................................................................35

## STATUTES

8 U.S.C. § 1101(b) ..............................................................................14

8 U.S.C. § 1101(c) ..............................................................................14

8 U.S.C. § 1401 ...........................................................................*passim*

8 U.S.C. § 1409 ...........................................................................*passim*

8 U.S.C. § 1503 ...................................................................2, 11, 21

22 U.S.C. § 2705 ..................................................................................7

47 U.S.C. §§ 521–559 ........................................................................29

## RULES AND REGULATIONS

8 FAM § 301.4(D)(1)(c) .......................................................................4

8 FAM § 301.9-2...............................................................................24

# TABLE OF AUTHORITIES
## (continued)

**Page**

8 FAM § 304.1-2(c) ................................................................4

8 FAM § 304.3-4(b)-(c) .........................................................26

Fed. R. Civ. P. 56(a)..............................................................9

## OTHER AUTHORITIES

103 Cong. Rec. 15,498 (1957) ...............................................14

Kerry Abrams & R. Kent Piacenti, *Immigration's Family Values*, 100
    Va. L. Rev. 629 (2014) ................................................24, 25

Black's Law Dictionary (11th ed. 2019) ..................................23

Kristin A. Collins, *Illegitimate Borders: Jus Sanguinis Citizenship
    and the Legal Construction of Family, Race, and Nation*,
    123 Yale L.J. 2134 (2014) ..............................................25

Kari E. Hong, *Removing Citizens: Parenthood, Immigration Courts,
    and Derivative Citizenship*, 28 Geo. Immigr. L.J. 277 (2014)..........24

H.R. Rep. No. 85-1199 (1957)..............................................14

*Lexico.com*, https://www.lexico.com/en/definition/of...........................23

*Merriam-Webster Dictionary*,
    https://www.merriam-webster.com/dictionary/of .............................23

*Oxford English Dictionary*
    https://www.oed.com/view/Entry/21674;
    https://www.oed.com/view/Entry/130549 ..................................22, 23

## I.    INTRODUCTION

This case is about family: about S.M.-G., the infant daughter of two married U.S. citizens, her parents James Derek Mize and Jonathan D. Gregg, and whether the United States government can disregard their familial and legal ties by fiat.

Pursuant to Section 301(c) of the Immigration and Nationality Act ("INA"), "a person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States . . . prior to the birth of such person," "shall be [a] national[] and citizen[] of the United States at birth." 8 U.S.C. § 1401(c). S.M.-G. is such a person. S.M.-G. was born in the United Kingdom in 2018 to her intended and only parents, Mize and Gregg, both of whom are U.S. citizens who resided here before her birth.

The State Department wrongfully refused to recognize S.M.-G.'s U.S. citizenship. It declined to issue her a passport pursuant to its own extra-textual requirement that a biological or "blood relationship" exist between a child and both of her married U.S.-citizen parents for citizenship to be conferred under Section 301(c)—a requirement contrary to the INA's plain language, overall structure, and purpose of promoting family unity. Requiring a biological relationship between a parent and a marital child for purposes of derivative citizenship is discriminatory and wrong. And as every court to consider the issue has found, it is also unlawful.

In addition, the Department of State's policy of interpreting Section 301 of the INA to require a biological relationship between a marital child and both of her U.S. citizen parents raises grave constitutional concerns, all which of counsel against the adoption of Defendants' proposed interpretation. By adopting their biological relationship requirement, Defendants disregarded the lawful marriage of Mize and Gregg, ignored the parent-child relationship between Mize and S.M.-G., and demeaned Plaintiffs' family. Defendants' reading of the statute would result in a deprivation of liberty and equality for all families headed by married same-sex couples, like Mize and Gregg, and should be rejected.

Plaintiffs move for summary judgment on their 8 U.S.C. § 1503(a) claim. The Court should declare S.M.-G. to be a citizen since birth, set aside Defendants' unlawful actions, and order Defendants to issue S.M.-G. a U.S. Passport.

## II.   FACTUAL AND STATUTORY BACKGROUND

### A.   The Immigration And Nationality Act And Defendants' Policy.

Persons born outside the United States acquire citizenship at birth only as provided by statute, namely the INA. *See Miller v. Albright*, 523 U.S. 420, 423-24 (1998). The INA sets out the circumstances under which persons born abroad are citizens at birth in two different provisions—Sections 301 and 309, which are codified at 8 U.S.C. §§ 1401 and 1409, respectively—and their application differs

2

depending on whether a child's parents are married or unmarried. *See Retuya v. Sec'y Dep't of Homeland Sec.*, 412 F. App'x 185, 187 (11th Cir. 2010) (contrasting 8 U.S.C. § 1401 with 8 U.S.C. § 1409). Section 301 sets forth categories of persons who "shall be nationals and citizens of the United States at birth," 8 U.S.C. § 1401, and has long been recognized to apply to anyone whose parents were lawfully married when he or she was born. *See*, *e.g.*, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017) (8 U.S.C. § 1401 is "[a]pplicable to married couples"). Section 301 makes no mention of a biological relationship.

By contrast, Section 309 applies only to children "born out of wedlock" and sets forth a number of additional and distinct requirements for citizenship at birth. *See* 8 U.S.C. § 1409. To establish the U.S. citizenship of a child born abroad to an unwed U.S.-citizen father, Section 309 requires (among other things) that "a blood relationship between the person and the father is established by clear and convincing evidence." 8 U.S.C. § 1409(a)(1).

Despite the absence of any "blood relationship" requirement in Section 301, the State Department imposes a biological relationship test for issuance of a U.S. passport. Specifically, the Department's internal Foreign Affairs Manual ("FAM") states that to be considered born "in wedlock"—and therefore eligible for U.S. citizenship under Section 301(c)—a child born abroad must have a biological

3

relationship with both of her married parents. *See* 8 FAM § 304.1-2(c).[1]

The State Department's extra-textual biological relationship requirement has changed over time, even while the statue has not. Prior to 2014, the State Department applied Section 309 to the children born abroad to a gestational but non-genetic mother—*i.e.*, a mother who had used an egg donor—even if she was the child's legal parent. Manning Decl., Ex. Q at 166:14-22. In 2014, the State Department changed course. It redefined the biological relationship requirement to deem gestational, non-genetic mothers to have a "biological" or "blood relationship" with the child—but *only* if the mother is also the child's legal parent. *See*, *e.g.*, 8 FAM § 301.4(D)(1)(c). This change was not occasioned by any congressional enactment or amendment to the INA. The State Department simply changed its mind. Manning Decl., Ex. Q at 243:15-20.

### B.   The Mize-Gregg Family.

Mize and Gregg are U.S. citizens who each resided in the United States prior to their daughter's birth. Mize was born in 1980 in Jackson, Mississippi. *See* Decl. of James Derek Mize ("Mize Decl.") at ¶ 3 & Ex. A. He grew up in the Jackson area, and moved to Ohio to attend college and later law school. *Id*. at ¶¶ 3, 5. In

---

[1] The Foreign Affairs Manual is available at fam.state.gov. For the Court's convenience, Plaintiffs have also included the cited FAM provisions as Exhibits N-P to the Declaration of Susan Baker Manning.

2009, Mize moved to New York City for work. *Id*. at ¶ 6.

Gregg is a U.S. citizen who was born in 1981 in London, England to his U.S.-citizen mother and his U.K.-citizen father. *See* Decl. of Jonathan D. Gregg ("Gregg Decl.") at ¶¶ 3, 4; Mize. Decl., Ex. B. Gregg grew up in London, with frequent trips to the United States to visit family. *Id*. at ¶ 3.

Mize and Gregg met in 2014 when Gregg was visiting New York City. Mize Decl. ¶ 6; Gregg Decl. ¶ 5. After several months of dating, Gregg transferred to his employer's New York offices, and he moved to the United States in November 2014. Mize Decl. ¶¶ 7, 9, 10 & Exs. C, D; Gregg Decl. ¶ 5, 6. Mize and Gregg discussed their mutual desire to have children early in their relationship, and when they got engaged, they did so with the hope and understanding that children would be part of their future together. Mize Decl. ¶ 13; Gregg Decl. ¶ 9. Mize and Gregg married on May 30, 2015 in New York City. Mize Decl. ¶ 11 & Ex. E; Gregg Decl. ¶ 7.

When Mize and Gregg were ready to move forward with bringing children into their family, they decided to seek an anonymous egg donor and to accept the invitation of a U.K.-based close friend to be their gestational surrogate. Mize Decl. ¶ 14; Gregg Decl. ¶ 10. All parties agreed and intended that Mize and Gregg would be the only parents of any child born via surrogacy. Mize Decl. ¶ 15 & Exs. F, G;

Gregg Decl. ¶ 11. In October 2017, a donated egg fertilized with Gregg's genetic material was implanted in the gestational surrogate, who became pregnant with Mize and Gregg's daughter S.M.-G. Mize Decl. ¶¶ 18, 19; Gregg Decl. ¶¶ 12, 13. Both parents made several visits to the U.K. during the pregnancy, and both were present in the U.K for substantial portions of the last trimester. Mize Decl. ¶¶ 21, 22; Gregg Decl. ¶¶ 14, 15.

S.M.-G. was born in the summer of 2018, with both Mize and Gregg present in the delivery room. Mize Decl. ¶ 23 & Ex. I; Gregg Decl. ¶ 16. Gregg cut the umbilical cord while Mize held their daughter. Mize Decl. ¶ 23; Gregg Decl. ¶ 16. The couple named their newborn daughter together, including giving her a hyphenated last name to reflect their status as a family, and Mize and Gregg's status as her parents. *Id*.

All three family members stayed in the hospital for three days, with Mize and Gregg caring for S.M.-G. and getting to know their daughter. Mize Decl. ¶ 25; Gregg Decl. ¶ 17. When they left the hospital, Gregg and Mize drove the surrogate to her home, and then brought S.M.-G. home with them. *Id*.; *see also generally* Mize. Decl., Ex. J.

In August 2018, Gregg and Mize applied for a Parental Order under Section 54 of the United Kingdom's Human Fertilisation and Embryology Act 2008 to

6

reflect their status as S.M.-G.'s parents. Mize Decl. ¶ 27; Gregg Decl. ¶ 18. On March 21, 2019, the Central London Family Court issued a Parental Order declaring "that [S.M.-G.], who was born on . . . 2018 is to be treated in law as the child of the parties to a marriage, Jonathan Daniel Gregg and James Derek Mize." Mize Decl., Ex. K. On April 17, 2019, the General Registrar Office issued a birth certificate identifying Mize and Gregg as S.M.-G.'s parents. *Id*., Ex. I.

## C.   Defendants' Refusal To Recognize S.M.-G.'s U.S. Citizenship.

On March 26, 2019, Mize took S.M.-G. to a Social Security Administration office in Atlanta to apply for a Social Security number. Mize was very surprised and disappointed when the staff declined to issue the Social Security number, stated that additional evidence of S.M.-G.'s citizenship was required, and advised him to return to London to establish her citizenship. Mize Decl. ¶¶ 32, 33. Worried, Mize and Gregg arranged to travel to London. Mize Decl. ¶ 32; Gregg Decl. ¶ 23.

On April 24, 2019, the family appeared at the U.S. Embassy in London to apply for a Consular Report of Birth Abroad ("CRBA") and a U.S. passport, Mize Decl. ¶ 35; Gregg Decl. ¶ 24, either of which would be proof of S.M.-G.'s citizenship. *See* 22 U.S.C. § 2705. At the Embassy, the family waited until they were called to a window where they presented S.M.-G.'s CRBA application (including each parent's U.S. passport, and a copy of their marriage certificate) and

passport application to an embassy staff person. *Id*. ¶ 26. The staff person went into a back room for some time before returning to ask who S.M.-G.'s father was. Mize Decl. ¶ 36; Gregg Decl. ¶ 25. Mize and Gregg explained that they are both S.M.-G.'s fathers. *Id*. When the staff person pressed for information on which father's sperm had been used to conceive S.M.-G., Mize and Gregg described the assisted reproductive technology ("ART") process they used to create their family. *Id*. The clerk asked the family to wait. *Id*.

After approximately three hours of waiting, embassy staff called the family to another window and informed them that S.M.-G.'s CRBA application was denied. Mize Decl. ¶¶ 37, 38; Gregg Decl. ¶¶ 26, 27. The head of the Passport and Citizenship Unit confirmed that embassy staff, in consultation with other State Department personnel "up the chain," had determined that S.M.-G. did not qualify for citizenship at birth, and provided a letter confirming denial of S.M.-G.'s CRBA application. Mize Decl. ¶ 38 & Ex. L; Gregg Decl. ¶ 27.

As the letter makes clear, the U.S. Embassy evaluated the application under sections 309 (applicable only to children "born out of wedlock") and 301(g) (applicable to the children of a U.S. citizen and a noncitizen). Mize Decl., Ex. L. The State Department had determined that S.M.-G. was *not* Mize and Gregg's marital child, and not Mize's child at all. The State Department did not recognize

Mize and Gregg's marriage, and it deemed the parent-child relationship between Mize and S.M.-G. irrelevant merely because he is not biologically related to her. Based on these deeply painful and humiliating determinations, *see* Mize Decl. ¶ 40; Gregg Decl. ¶ 28, the State Department denied S.M.-G.'s CRBA application on the sole ground that "the biological U.S. citizen parent [Gregg] was not physically present in the United States for five years prior to the child's birth . . . as required under the provisions of § 301(g) of the [INA]." Mize Decl., Ex. L.

## III.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party shows "an absence of evidence to support the nonmoving party's case," summary judgment is warranted unless the non-movant presents competent evidence showing a genuine issue exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986); *see also Hurst v. Youngelson*, 354 F. Supp. 3d 1362, 1367–68 (N.D. Ga. 2019). "The essential question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Kemper v. Equity Ins. Co.*, 396 F. Supp. 3d 1299, 1302 (N.D. Ga. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## IV.   ARGUMENT

Section 301 of the INA provides that "a person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States . . . prior to the birth of such person," "shall be [a] national[] and citizen[] of the United States at birth." 8 U.S.C. § 1401(c). As a child born of her married parents, both of whom are U.S. citizens, S.M.-G. is a citizen at birth under the plain terms of this section.

The facts are undisputed: Mize and Gregg are U.S. citizens who are married to each other, and who both resided in the United States prior to S.M.-G.'s birth; S.M.-G. was born abroad during Mize and Gregg's marriage; and, S.M.-G. is the legal, marital child of Mize and Gregg, her intended and only parents. Mize Decl. ¶¶ 3-7, 14, 15, 18, 19, 23, 25, Exs. A-I, K; Gregg Decl. ¶¶ 3-7, 10-13, 16, 17. Based on these facts, pursuant to Section 301(c) of the INA, S.M.-G. is and has been a U.S. citizen since her birth.

Defendants nevertheless refuse to recognize S.M.-G. as a U.S. citizen because they erroneously graft onto Section 301 a requirement that the children of married U.S. citizens have a "biological" relationship with both of their married parents. This added requirement is contrary to the INA, and has been repeatedly rejected by the courts. Moreover, it categorically disrespects the marriages of

10

same-sex couples, and, by definition, excludes children born abroad to same-sex couples from birthright citizenship. This not only harms these families, but also raises serious due process and equal protection concerns. Nothing in Section 301, or any other provision of the INA, suggests that in using the phrase "born . . . of parents" Congress intended to refer only to parents who are both legal *and* biological parents.

The INA empowers this Court to issue a *de novo* declaration that S.M.-G. is a U.S. citizen. *See* 8 U.S.C. § 1503(a). Based on the text, structure, and purpose of the INA, and in order to avoid running afoul of constitutional liberty and equality principles, this Court should grant summary judgment on S.M.-G.'s Section 1503(a) claim, and declare S.M.-G. to be a U.S. citizen since birth pursuant to Section 301(c) of the INA, with all the rights and privileges of such citizenship.

**A.    The Text, Structure, And Purpose Of Section 301 Make Clear That S.M.-G. Is A U.S. Citizen, And Has Been Since Birth.**

**1.    The plain language of Section 301(c) does not require a child to have a biological relationship with both of her married parents.**

Defendants read into Section 301 a requirement—that a child and both her parents have a biological or "blood relationship"—that is simply not present in the statutory text. Section 301's plain language cannot support this invented prerequisite to citizenship-at-birth; the law says nothing about biology. If it had

wanted to do so, Congress knew how to require a genetic or "blood relationship" between a parent and child. The plain text of Section 309—the only other provision of the INA that deals with citizenship at birth—specifies that "a person born out of wedlock" is a U.S. citizen only if several requirements are met, including that "a blood relationship between the person and the [U.S.-citizen] father is established by clear and convincing evidence." 8 U.S.C. § 1409(a)(1). Section 301 contains no such requirement for the children of married U.S. citizens.

This difference is dispositive. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotations omitted). Here, "Congress clearly specified enhanced requirements for proof of parentage in the case of children born out of wedlock" and "the 'textual distinction' between the sections regarding children of married parents and children of unmarried parents is strongly suggestive of a clear Congressional intent to treat the two categories differently on this point." *Jaen v. Sessions*, 899 F.3d 182, 189 (2d Cir. 2018); *see also Scales v. INS*, 232 F.3d 1159, 1164-65 (9th Cir. 2000) (contrasting Sections 301 and 309 and holding that Section 301 does not require a blood relationship).

### 2. Defendants' reading of Section 301 is inconsistent with the design and structure of the INA.

Defendants' grafting of an extra-textual biological relationship requirement onto Section 301 should also be rejected in light of "its inconsistency with the design and structure of the statute as a whole." *Univ. of Tex. Sw. Med. Center v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices."). Section 309(a) incorporates the provisions of Section 301(c), (d), (e), and (g), as applicable, and then further requires that "a blood relationship between the person and the father [be] established by clear and convincing evidence." 8 U.S.C. § 1409(a). The explicit "blood relationship" requirement in Section 309(a) would be superfluous if paragraphs (c), (d), (e), and (g) of Section 301 already required a biological relationship. The Supreme Court has repeatedly "cautioned against reading a text in a way that makes part of it redundant." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007); *see also United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992) (applying the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

Other provisions of the INA are consistent with Plaintiffs' reading. Sections 301 and 309 are part of Title III of the INA, which does not define "parent" beyond clarifying that it includes a deceased parent, much less define it to mean only

biological or genetic parents. *See* 8 U.S.C. § 1101(c)(2). For purposes of Titles I and II, the INA defines "parent" as "a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in subdivision (1) of this subsection." 8 U.S.C. § 1101(b)(2). Subdivision (1), in turn, defines "child" to mean "an unmarried person under twenty-one years of age" who is "a child born in wedlock," is a stepchild, or, if not born in wedlock, meets certain criteria, such as, for example, having been "legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile." 8 U.S.C. § 1101(b)(1)(A)-(C). Taken together, Titles I, II, and III reflect the INA's broad approach to the term "parent," and narrow the term's scope only in the case of non-marital children—a situation not applicable to S.M.-G. and others like her.

### 3. The INA reflects Congress's intent to keep families together.

The legislative history of the INA "clearly indicates that Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." H.R. Rep. No. 85-1199, at 7 (1957); *see also Nation v. Esperdy*, 239 F. Supp. 531, 538 (S.D.N.Y. 1965) ("'[T]hese provisions are designed to clarify or adjust existing provisions of law in the interest of reuniting broken families . . . .'" (quoting 103 Cong. Rec. 15,498 (1957) (statement of Sen. John F. Kennedy))).

In rejecting a biological relationship requirement in Section 301, the Ninth Circuit recognized that "[t]he [INA] was intended to keep families together [and] should be construed in favor of family units and the acceptance of responsibility by family members." *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005); *see also Sook Young Hong v. Napolitano*, 772 F. Supp. 2d 1270, 1278-79 (D. Haw. 2011) (collecting cases regarding the proposition that "maintenance of family unity and . . . the liberal treatment of children represent well-known goals of the INA"). The State Department's interpretation of Section 301(c) does exactly the opposite, especially for families headed by same-sex couples like Plaintiffs.

> **4.    Section 301(c) must be understood against the backdrop of the common law spousal presumption of parentage, which does not hinge on biology.**

In omitting any reference to a biological or blood relationship requirement from Section 301, Congress incorporated the general common law spousal presumption of parentage (sometimes referred to as a "marital presumption" "presumptive parentage," or a presumption of "legitimacy"). The long-standing presumption that every child born during the marriage of two people is the legal child of both spouses, regardless of "blood" ties, forms the essential backdrop against which statute's use of the term "parent" must be understood. *See NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have

accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.").

"The presumption of legitimacy was a fundamental principle of the common law." *Michael H. v. Gerald D.*, 491 U.S. 110, 124 (1989) (upholding presumption recognizing married father's parental status even where it was undisputed that he was not the child's biological parent). *See also Ray v. Bryant*, 411 F.2d 1204, 1205 (5th Cir. 1969) ("The presumption of legitimacy in favor of children born in wedlock is universally recognized.") This spousal presumption of parentage is rooted in the historic respect for marital family units, and is designed to protect both the peace and tranquility of the family, and the child's rights of support and inheritance from both married parents. *Michael H.*, 491 U.S. at 123-25; *Murphy v. Houma Well Serv.*, 413 F.2d 509, 512 (5th Cir. 1969) ("The presumption of legitimacy is without question reasonably related to the encouragement of family stability[.]"). It is incorporated into domestic relations laws across the country, *see*, *e.g.*, *McMillian by McMillian v. Heckler*, 759 F.2d 1147, 1153 (4th Cir. 1985) (noting that marital presumption is applied in "most, if not all" states); *Jaen*, 899 F.3d at 189 (noting states' incorporation of the presumption into their domestic relations laws), and in light of this "universal appli[cation] by the states," has been

16

recognized as an element of federal common law regarding the parentage of marital children. *McMillian*, 749 F.2d at 1153.

More specifically, the marital presumption sets forth that when a child is born into a marriage, both spouses are presumed to be that child's legal parents regardless of biology. *See Michael H.*, 491 U.S. at 124-26; *Murphy*, 413 F.2d at 512. This understanding is reflected in case law across the country applying the presumption even when it is undisputed that only one spouse is a biological parent, including when the spouses are of the same sex. *See*, *e.g.*, *L.C. v. M.G.*, 430 P.3d 400, 410, 412 (Haw. 2018) (non-birth mother married to birth mother presumed to be the child's legal parent; noting that presumption of parentage is "not restricted to persons that share a biological or genetic link with the child"); *McLaughlin v. Jones in & for Cty. of Pima*, 401 P.3d 492, 497 (Ariz. 2017) (same); *Boquet v. Boquet*, 269 So. 3d 895, 900 (La. Ct. App. 2019), *writ denied*, 274 So. 3d 1261 (La. 2019) (non-birth mother presumed to be parent of child born to same-sex spouse); *In re Christopher YY. v. Jessica ZZ*, 159 A.D.3d 18, 24 (N.Y. App. Div. 3d Dep't 2018) ("As the child was born to respondents, a married couple, they have established that the presumption of legitimacy applies, a conclusion unaffected by the gender composition of the marital couple or the use of informal artificial insemination by donor."); *In re Baby Doe*, 353 S.E.2d 877, 878 (S.C.

1987) (applying common law presumption of parentage to children conceived using donor sperm).

This established common law presumption of parentage is incorporated into the meaning of "parent" in Section 301. *See Jaen*, 899 F.3d at 189 (Section 301 "incorporates the common law deference to the marital family"). Nothing in the text or context of the INA suggests that Congress intended to overthrow this centuries-old understanding that marital children are the legal children of both spouses. "It is a well-established rule of construction that where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meanings of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (alterations and quotations omitted). When it enacted the INA, Congress did not suggest—much less dictate—any deviation from the common-law rule that parentage does not turn solely on biology.

### 5. Courts have repeatedly rejected Defendants' reading of Section 301.

Defendants' interpretation of the statute is directly contrary to the decisions of every court to consider whether Section 301 requires a biological relationship between a child and both married parents. In *Scales*, the Ninth Circuit held that a child born to a noncitizen mother married to a U.S. citizen man acquired derivative

citizenship from his legal father even when it was undisputed that the U.S. citizen was not the child's biological father. 232 F.3d at 1166.[2] The court stated directly that "[t]here is no requirement of a blood relationship between Petitioner and his citizen father, as there is for an illegitimate child." *Id*. "A straightforward reading" of the "born . . . of parents" language in Section 301, the court reasoned, "indicates . . . that there is no requirement of a blood relationship." *Id.* at 1164. The court contrasted Section 301 with Section 309, which does require a blood relationship between a non-marital child and a U.S. citizen father, but which "d[id] not apply to [Scales] . . . because he was born to parents who were married at the time of his birth." *Id*. Finally, the court in *Scales* explained that "[i]f Congress had wanted to ensure" that a person born of married parents only one of whom was a U.S. citizen "actually shares a blood relationship with an American citizen," "'it knew how to do so.'" *Id*. (quoting *Custis v. United States*, 511 U.S. 485, 492 (1994)). As such, the court refused to defer to the FAM, which so diverged from the statute that it could not be deemed "an interpretation of § 1401." *Id*. at 1165-66.

---

[2] In *Scales* and other cases in this section, the children's claims proceeded under Section 301(g) because only one of their married parents was a U.S. citizen. Here, S.M.-G.'s claim arises under Section 301(c) because both of her married parents are U.S. citizens. Both subsections use the "born . . . of parents" formulation, and decisions interpreting Section 301(g) apply equally to Section 301(c).

Five years later, the Ninth Circuit reaffirmed *Scales* in *Solis-Espinoza*, a case in which a child conceived during an extramarital affair between his noncitizen father and a noncitizen woman sought recognition of his birthright citizenship. *Solis-Espinoza*, 401 F.3d at 1091. Stressing the INA's purpose of maintaining family integrity, the court held that Solis-Espinoza derived U.S. citizenship under Section 301 from his father's wife, the U.S. citizen who raised him from birth and was "in every practical sense" the child's mother, notwithstanding the absence of a biological relationship between them. *Id*. at 1094. The court explained that the blood relationship requirement applied only to a non-marital child and not to someone like petitioner "who was not born 'out of wedlock.'" *Id*. at 1093.

> In every practical sense, [the wife of petitioner's biological father] was petitioner's mother and he was her son. There is no good reason to treat petitioner otherwise. Public policy supports recognition and maintenance of a family unit. The [INA] was intended to keep families together. It should be construed in favor of family units and the acceptance of responsibility by family members.

*Id*. at 1094.

The Second Circuit reached the same conclusion in *Jaen*. The court held that parentage under Section 301 imported the common law marital presumption such that the husband of Jaen's mother at the time of his birth was his parent for purposes of Section 301 even though he was not biologically related to Jaen. 899

F.3d at 188. "[T]he INA incorporates the common law meaning of 'parent' into [Section 301(g)], such that a child born into a lawful marriage is the lawful child of those parents, regardless of the existence or nonexistence of any biological link." *Id*. at 185. The court contrasted Sections 301 and 309, noting that, "[t]here is no comparable additional requirement for the establishment of paternity in the section regarding citizenship via *married* parents. Consistent with the common law presumption, paternity is simply assumed in the case of married parents." *Id*. at 189. As in *Scales*, the *Jaen* court rejected the argument that the FAM was entitled to deference. *Id.* at 187 n.4. These directly-on-point decisions confirm that the term "parents" as used in Section 301 is not limited to biological parents.

In an analogous case involving a child born to a married male same-sex couple through ART, the court held that, "the word 'parents' as used in Section 301(g) is not limited to biological parents and that the presumption of legitimacy that applies when a child is born to married parents—as codified in the INA— cannot be rebutted by evidence that the child does not have a biological tie to a U.S. citizen parent." *Dvash-Banks v. Pompeo*, No. 2:18-cv-00523, 2019 WL 911799, *7 (C.D. Cal. Feb. 21, 2019) (granting summary judgment, issuing a declaration of U.S. citizenship under 8 U.S.C. § 1503(a), and ordering Defendants to issue a passport), *appeal docketed*, No. 19-55517 (9th Cir. May 7, 2019).

### 6.    Defendants' definitional argument is unavailing.

Finding no refuge in the ordinary rules of statutory construction or precedent, Defendants have previously resorted to a "textual" argument that defies the plain language of the statute through the use of cherry-picked dictionary definitions. *See* ECF Doc. 32-1 at 19-20. Defendants offer the following unsound syllogism: Because "born" is defined as "to be brought forth as offspring" and "of" refers to the origin of a person, to be "born of parents" must mean that the child "originates or derives" from the parents. As such, so the argument goes, Section 301's reference to children "born . . . of parents" necessarily means "biologically related" *to both parents* because a child cannot "originate or derive" from parents unless the child is biologically related to *both*. *See id*. This simply does not follow.

First, it is *not* the case that a child born using ART does not "originate" or "derive from" the parents who used that technology to bring her into the world, nor that a child cannot be "brought forth as offspring" unless two married individuals have contributed their genetic material to her. The *Oxford English Dictionary*—the same dictionary Defendants cite—also defines "born" as "to come into existence" (Def. I.2(a)), and it further states that "of" "[i]ndicat[es] the *agent or doer*" (Def. IV.A.), thus supporting an interpretation of "born of . . . parents" as meaning *coming into existence* because of the parents. *See* Born, *Oxford English Dictionary*,

https://www.oed.com/view/Entry/21674;   Of,   *Oxford   English   Dictionary*,
https://www.oed.com/view/Entry/130549 (emphasis added).

Second, the definition of the preposition "of" does not support Defendants'
argument. Defendants define "of" as indicating the "person from . . . whom
something originates, comes, or is acquired or sought." ECF Doc. 32-1 at 20. That
a child originates from—that is, comes into being through the actions of—their
parents is the *sine qua non* of intentional parenthood, as is the case here. Other
dictionaries' definitions support this conclusion. *See*, *e.g*., Of, *Merriam-Webster
Dictionary*,   https://www.merriam-webster.com/dictionary/of   (defining   "of"   as
"used   as   a   function   word   to   indicate   the   cause,   motive,   or   reason"); Of,
*Lexico.com*,     https://www.lexico.com/en/definition/of     (defining     "of"     as
"[i]ndicating an association between two entities, typically one of belonging").

### 7.   Defendants' reliance on the Roman concept of *jus sanguinis* is misplaced.

Defendants have also rationalized their policy by relying on the Roman
concept of *jus sanguinis*. *See* ECF Doc. 32-1 at 2 & 20-21. That argument also
does not withstand scrutiny. The Latin phrase "*jus sanguinis*" literally refers to the
"right of blood," *see* Black's Law Dictionary (11th ed. 2019). Only Section 309
refers to a required "blood relationship" while Section 301 does not. That is
because, instead of adopting this Roman concept, the INA created a distinct

statutory framework for "derivative citizenship." *See* Kari E. Hong, *Removing Citizens: Parenthood*, *Immigration Courts*, *and Derivative Citizenship*, 28 Geo. Immigr. L.J. 277, 289 (2014) ("Derivative citizenship is the means by which U.S. citizenship is conferred to foreign-born children when certain conditions are met."); *see also*, *e.g.*, *Morales-Santana*, 137 S. Ct. at 1688 (analyzing "claim to citizenship derived from the U.S. citizenship of [the] father"); 8 FAM § 301.9-2 (discussing "acquisition of derivative citizenship").

The historical context of how citizenship has been derived in the United States undermines Defendants' argument. A blood relationship has never been either necessary or sufficient to pass on derivative U.S. citizenship. Historically, derivative citizenship required a *legal* parental relationship, and unmarried men had no such relationship with their biological children. *See Guyer v. Smith*, 22 Md. 239, 249 (1864) (children "not born in lawful wedlock . . . under our law [are] *nullius filii*, and … not within the provisions of [the citizenship act]"); Kerry Abrams & R. Kent Piacenti, *Immigration's Family Values*, 100 Va. L. Rev. 629, 657 (2014) (under "nineteenth century . . . citizenship laws," "children acquiring citizenship at birth had to be *legitimate*").

At the same time, by contrast, because the law treated a husband as the legal father of a child to whom his wife gave birth, a husband could confer derivative

citizenship on his child even if he was not the child's biological father. *See id.* at 658 ("The interaction of the marital presumption of paternity with nineteenth-century courts' interpretations of these early citizenship acts meant that, almost certainly, citizenship sometimes passed from U.S. citizen fathers to foreign-born marital children to whom they were not biologically related. . . . Thus it becomes clear that it was marriage rather than blood that was doing the work in the Acts of 1790, 1802, and 1855."). Put simply, historically speaking, "[m]arriage was the conduit by which a man could transfer citizenship to the children of his wife, whether or not they were his biological children." *Id.*

Thus, although "[d]erivative citizenship for non-marital children of American fathers requires demonstration of a 'blood relationship,'" such "statutory requirement . . . does not apply to marital children." Kristin A. Collins, *Illegitimate Borders: Jus Sanguinis Citizenship and the Legal Construction of Family*, *Race*, *and Nation*, 123 Yale L.J. 2134, 2223-24 n.353 (2014).

Defendants further cite *Miller v. Albright*, 523 U.S. 420 (1998), and *Nguyen v. INS*, 533 U.S. 53 (2001), in support for their argument that Section 301 incorporates the concept of *jus sanguinis*. But *Miller* and *Nguyen* were cases involving actual non-marital children who therefore fell within the purview of Section 309 of the INA, not Section 301. *Miller* holds that when parental rights

have not been established, requiring blood relationship in Section 309 to ensure that there is reliable proof of that relationship is an important government objective. 523 U.S. at 436. But here, where Section 301 omits any reference to a "blood relationship," the State Department cannot substitute its policy preferences for those chosen by Congress. And no one disputes Mize and Gregg's parental rights. Not only does S.M.-G.'s birth certificate list Mize and Gregg as her only parents, so does other documentary evidence, including the Parental Order issued by the Central London Family Court, which declares Gregg and Mize to be S.M.-G.'s only parents. Mize Decl., Exs. I, K. Simply put, there are no indicia of fraud or lack of proof of the parent-child relationship; to the contrary, Plaintiffs' status as a family is well-documented. *See* Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss (Doc. 35-1) at 10-12. As Defendants admit, cases involving surrogacy usually have ample medical and legal documentation evidencing the relationship between a child and their parents, including legal documents that usually "detail the various 'parties' intentions with respect to future parental rights." *See* 8 FAM § 304.3-4(b)-(c).

Neither tortured dictionary definitions nor relics of Roman law undermine the fact that the text, structure, and purpose of Section 301 all lead to the same unequivocal conclusion: the derivative citizenship of a marital child like S.M.-G.

does not depend on a biological relationship with both married parents.

**B.    Section 301 Must Be Read To Reject Defendants' Biological Relationship Requirement As A Matter Of Constitutional Avoidance.**

If, *arguendo*, the Court nonetheless considers the meaning of Section 301 ambiguous, the canon of constitutional avoidance weighs in favor of Plaintiffs' plausible interpretation. Defendants' addition of a biological relationship requirement is not only contrary to the statute, it also raises serious constitutional concerns about whether Defendants' policy violates the Fifth Amendment due process and equal protection rights of families headed by married same-sex couples, like the Plaintiffs. Accordingly, even if the Court were to view Section 301 as susceptible of more than one construction, the canon of constitutional avoidance strongly favors rejecting Defendants' biological relationship requirement and choosing the interpretation that does not raise those constitutional concerns.

**1.    The Court should employ the canon of constitutional avoidance to avoid addressing the serious constitutional questions raised by Defendants' interpretation.**

"The elementary rule is that every reasonable construction [of a statute] must be resorted to in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895). As such, the Eleventh Circuit has cautioned

that "[w]e avoid statutory interpretations that raise constitutional problems." *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1282 (11th Cir. 2019). This well-established canon of constitutional avoidance is "an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). It "has no application in the absence of statutory ambiguity," *U.S. v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001), but when "choosing between competing plausible interpretations," the canon rests "on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

"[O]ne of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions." *Id.*; *see also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988) (canon of constitutional avoidance merely calls for a determination that a certain interpretation "would *raise* serious constitutional problems" (emphasis added)). "[T]he canon of statutory interpretation . . . seeks to avoid constitutional difficulties." *Cable Holdings of Ga., Inc. v. McNeil Real Estate Fund VI, Ltd.*, 953 F.2d 600, 610 (11th Cir. 1992).

Thus, when "an otherwise acceptable construction of a statute would raise

serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (citations omitted); *see also Pine v. City of West Palm Beach*, 762 F.3d 1262, 1270–71 (11th Cir. 2014) (construing ordinance to "avoid serious constitutional concerns" where the interpretation was "not plainly contrary to legislative intent" as set forth in law's text and structure); *Cable Holdings of Ga., Inc*, 953 F.2d at 609–10 (adopting interpretation of the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521–559 (1988), that serves "to avoid constitutional difficulties"). Plaintiffs' proposed reading of Section 301 is entirely plausible and more than consistent with the application of ordinary rules of statutory construction, *see* Part IV.A, *supra*, and should be adopted to avoid the constitutional concerns raised by Defendants' interpretation.

### 2. Defendants' interpretation of Section 301 raises serious constitutional problems.

In applying a biological relationship requirement to Section 301, Defendants have ignored Mize and Gregg's lawful marriage, deemed their daughter not to be their marital child, and treated Mize and S.M.-G. as legal strangers. In short, they have treated the Mize-Gregg family as if they were not a family at all. Adopting Defendants' interpretation of Section 301 would create serious constitutional

liberty and equality concerns for families headed by married same-sex couples, such as the Mize-Greggs. At minimum, it would raise serious constitutional questions about whether the biological relationship requirement violates (1) same-sex couples' fundamental right to marry and attendant, protected liberty interests in their marriage; (2) the fundamental rights of families headed by same-sex couples to be recognized as a family, including the rights to family privacy, integrity, and association; and, (3) the right to equal protection for same-sex couples and their children.

> a. **Defendants' biological relationship requirement would run afoul of the liberty and equality principles recognized in *Windsor*, *Obergefell*, and *Pavan*.**

Defendants' biological relationship requirement has the effect of disregarding the marriages of same-sex couples who, by definition, cannot both be genetic parents, and of deeming their children not to be marital children. In so doing, this interpretation would violate the principles articulated by the Supreme Court in *United States v. Windsor*, 570 U.S. 744 (2013), *Obergefell v. Hodges,* 135 S. Ct. 2584 (2015), and *Pavan v. Smith*, 137 S. Ct. 2075 (2017) (per curiam), which mandate the equal treatment of same-sex couples' marriages, as well as equal access to the full "constellation of benefits" attendant to marriage, *Obergefell*, 135 S. Ct. at 2601. In other words, the "precepts of liberty and equality

under the Constitution" prohibit the denial of legal benefits and protections to same-sex couples based on governmental refusal to treat their marriages in the same way that marriages of different-sex couples. *Obergefell*, 135 S. Ct. at 2604; *see also Windsor*, 570 U.S. at 772-74. The Supreme Court has "acknowledged the interlocking nature of these constitutional safeguards in the context of the legal treatment of gays and lesbians." *Obergefell*, 135 S. Ct. at 2604.

Here, citizenship under Section 301 *without the added burdens imposed by Section 309* is not a mere "right granted by Congress," ECF Doc. 32-1 at 15, it is part of the "constellation of benefits that [Congress] ha[s] linked to marriage." *Obergefell*, 135 S. Ct. at 2601. Yet, adopting Defendants' biological relationship requirement would unconstitutionally "impose[] restrictions and disabilities" on same-sex couples' valid marriages, instructing them and their children "that their marriage is less worthy than the marriages of others." *Windsor*, 570 U.S. at 768, 775. By refusing to recognize the children of married same-sex couples as marital children for purposes of citizenship under Section 301, Defendants' policy treats same-sex couples' marriages as "second-class marriages for purposes of federal law." *Windsor*, 570 U.S. at 771. This "differential treatment infringes *Obergefell*'s commitment to provide same-sex couples 'the constellation of benefits that the States have linked to marriage.'" *Pavan*, 137 S. Ct. at 2077 (quoting *Obergefell*,

135 S. Ct at 2601).

"This raises a most serious question under the Constitution's Fifth Amendment." *Windsor*, 570 U.S. at 771. Because marriage's function in "safeguard[ing] children and families" is one reason that the Constitution protects the right to marry, *Obergefell*, 135 S. Ct. at 2600, any government conduct that deprives married same-sex couples and their children of those protections is unconstitutional. *Id.* at 2601-02.

Put simply, Defendants' interpretation of Section 301 would "burden the liberty of same-sex couples, and . . . abridge central precepts of equality." *Obergefell*, 135 S. Ct. at 2604. The Court therefore should adopt Plaintiffs' interpretation of Section 301 in order to avoid confronting these serious constitutional questions.

> **b.     Defendants' interpretation would infringe upon Plaintiffs' fundamental rights to family formation, integrity, and privacy.**

Defendants' biological relationship requirement would also infringe the fundamental rights of families headed by same-sex couples, like Plaintiffs, to form and be a family. "[C]hoices concerning . . . family relationships, procreation, and childrearing," are "among the most intimate that an individual can make." *Obergefell*, 135 S. Ct. at 2599. These rights are intertwined with the right to marry

to make "a unified whole: The right to 'marry, establish a home and bring up children.'" *Id.* at 2600 (quotes and alteration omitted). This collective set of fundamental rights is violated by laws, regulations, and policies that "humiliate[] . . . children . . . being raised by same-sex couples and . . . make[] it even more difficult for the children to understand the integrity and closeness of their own family." *Windsor*, 570 U.S. at 772. Defendants' biological relationship requirement would deny birth citizenship to children like S.M.-G. in violation of the fundamental right to form a family of married same-sex parents and their children.

In addition, requiring a biological relationship in order for a marital child to derive citizenship from one of her two parents would disregard legal parent-child relationships and would unravel "[t]he intangible fibers that connect parent and child." *Lehr v. Robertson*, 463 U.S. 248, 256 (1983). Infringements of parent-child relationships are cognizable constitutional harms, *see Stanley v. Illinois*, 405 U.S. 645, 647-48 (1972), and the right to family integrity is equally shared by both parents and children. *See Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000).

Finally, the insertion of a biological relationship requirement into Section 301 would require invasive inquiries into intimate decisions about procreation and how married same-sex couples brought children into their families. This raises

concerns about the invasion of the fundamental right to decisional privacy. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687 (1977). These protections extend to the childbearing and childrearing decisions and deliberations of all families, including those headed by same-sex couples. *Windsor*, 570 U.S. at 772.

Defendants' proposed interpretation of Section 301 would substantially burden the fundamental rights of families formed by married same-sex couples to establish and be a family and would unnecessarily invade their privacy. By adopting Plaintiffs' plausible interpretation of Section 301, the Court can and should avoid adjudication of these serious constitutional questions.[3]

### c.     Defendants' interpretation would raise serious equal protection concerns.

Defendants' biological relationship requirement also raises serious constitutional concerns under the equal protection component of the Fifth Amendment. Interpreting Section 301 in this way would treat the marriages of same-sex couples as second class, discriminate against those couples on account of their sexual orientation and sex, and discriminate against their children based on

---

[3] For the reasons set forth in Part V of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss, Defendants cannot meet their burden of justifying their interpretation of Section 301, which infringes the due process mandate of the Fifth Amendment. *See* Doc. 35-1, at 12-19.

the circumstances of their birth. "The Constitution grants [same-sex couples and their children] th[e] right" to "equal dignity in the eyes of the law." *Obergefell*, 135 S. Ct. at 2608. Defendants' interpretation of Section 301 raises serious concerns that right would be denied.

Under Defendants' interpretation, the marital and parental relationships of married same-sex couples will always be presumed invalid, and their applications for recognition of their child's citizenship will always be subject to additional scrutiny, obstacles, and review. By contrast, the marital and parental relationships of married different-sex couples are presumed valid.[4] Defendants' interpretation of Section 301 would thus "identify a subset of state-sanctioned marriages and make them unequal," *Windsor*, 570 U.S. at 772, depriving same-sex couples of equal protection. It would "deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages" and "impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex

---

[4] While some different-sex couples who disclose that they have used ART to have children may also be wrongly treated as unmarried couples, and some gestational, non-genetic mothers might rightfully be recognized as a parent under Defendants' policy, these rare exceptions to the discriminatory rule would not permit Defendants' interpretation to pass constitutional muster. This kind of over- and under-inclusiveness is constitutionally fatal. *See Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974); *Zablocki v. Redhail*, 434 U.S. 374, 390 (1978); *Eisenstadt v. Baird*, 405 U.S. 438, 454 (1972).

marriages made lawful by the unquestioned authority of the States." *Id*. at 770.

Specifically, the disparate treatment of married same-sex couples and their children under Defendants' interpretation of Section 301 would discriminate against those couples on the bases of sexual orientation and sex and against their children because of the circumstances of their birth, all in violation of the equal protection component of the Fifth Amendment. Each of these forms of discrimination would render Defendants' interpretation constitutionally suspect.

The level of scrutiny applicable to sexual orientation discrimination is an open question in this Circuit. *See Morrissey v. United States*, 871 F.3d 1260, 1270 (11th Cir. 2017). The Eleventh Circuit previously observed that other circuits had declined to apply heightened scrutiny, *see Lofton v. Sec'y of Dep't of Children & Family Servs*., 358 F.3d 804, 818 (11th Cir. 2004), but that occurred before *Obergefell* and *Windsor*, which require that heightened scrutiny be applied to classifications based on sexual orientation. *See SmithKline Beecham Corp. v. Abbott Labs*., 740 F.3d 471, 484 (9th Cir. 2014) (*Windsor* requires courts "to apply heightened scrutiny to classifications based on sexual orientation for purposes of equal protection."); *see also Windsor v. United States*, 699 F.3d 169, 181-82 (2d Cir. 2012) (analyzing sexual orientation as a "quasi-suspect class"), *aff'd*, 570 U.S. 744 (2013).

Similarly, laws that treat different-sex and same-sex couples disparately "constitute gender discrimination both facially and when recognized, in their historical context, both as resting on sex stereotyping and as a vestige of the sex-based legal rules once imbedded in the institution of marriage." *Latta v. Otter*, 771 F.3d 456, 490 (9th Cir. 2014) (Berzon, J., concurring); *see also Waters v. Ricketts*, 48 F. Supp. 3d 1271, 1281 (D. Neb. 2015) (a law "that mandates that women may only marry men and men may only marry women facially classifies on the basis of gender"), *aff'd on other grounds*, 798 F.3d 682 (8th Cir. 2015); *Kitchen v. Herbett*, 961 F. Supp. 2d 1181, 1206 (D. Utah 2013) (finding that Utah's marriage laws prohibiting "a man from marrying another man," but not "from marrying a woman," classify based on sex), *aff'd on other grounds*, 755 F.3d 1193 (10th Cir. 2014). And "[l]aws granting or denying benefits 'on the basis of the sex of the qualifying parent,' . . . differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee." *Morales-Santana*, 137 S. Ct. at 1689.

Lastly, Defendants' interpretation would penalize children for the circumstances of their birth by denying them important rights and protections—a policy that is "illogical and unjust" and subject to heightened scrutiny. *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175-76 (1972). It is "invidious to

discriminate against" the marital children of same-sex couples "when no action, conduct, or demeanor of theirs" is relevant to the conferral of citizenship by their citizen parents. *Levy v. Louisiana*, 391 U.S. 68, 72 (1968). And "imposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber*, 406 U.S. at 175.

All of these constitutional equality concerns warrant against this Court's adoption of Defendants' biological relationship interpretation of Section 301.[5] The Court can avoid answering these constitutional questions by choosing Plaintiffs' plausible text-based interpretation, which applies even-handedly to all married couples and their children.

## V.    CONCLUSION

Because Defendants' policy and actions run counter to the text, structure, and purpose of the INA, and because their interpretation of Section 301 would raise serious constitutional questions, the Court should grant Plaintiffs' Motion for

---

[5] For the reasons set forth in Part VI of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss, Defendants' interpretation of Section 301 is unlikely to survive any level of scrutiny and thus violate the equal protection mandate of the Fifth Amendment. *See* Doc. 35-1, at 19-25.

Partial Summary Judgment, declare S.M.-G. to be a U.S. citizen since birth, and order Defendants to issue her a U.S. passport.

Dated this 17th day of January, 2020.

Respectfully submitted,

/s/ *Omar Gonzalez-Pagan*

Susan Baker Manning*
Eleanor Pelta*
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-3000
susan.manning@morganlewis.com
eleanor.pelta@morganlewis.com

John A. Polito*
Christie P. Bahna*
MORGAN LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, California 94105
Telephone: (415) 442-1000
john.polito@morganlewis.com
christie.bahna@morganlewis.com

Jacquelynne M. Hamilton*
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-5000
jacquelynne.hamilton@morganlewis.com

  *Admitted *pro hac vice*

Omar Gonzalez-Pagan*
Karen L. Loewy*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Tara L. Borelli (Bar No. 265084)
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC
Southern Regional Office
730 Peachtree Street NE, Suite 640
Atlanta, Georgia 30308
Telephone: (404) 897-1880
tborelli@lambdalegal.org

Aaron C. Morris*
IMMIGRATION EQUALITY
40 Exchange Place, Suite 1300
New York, New York 10005-2744
Telephone: (212) 714-2904
amorris@immigrationequality.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| JAMES DEREK MIZE, et al.,<br><br>                    *Plaintiffs,*<br><br>v.<br><br>MICHAEL R. POMPEO, et al.,<br><br>                    *Defendants.* | Civil Action No. 1:19-cv-3331-MLB |

**CERTIFICATE OF SERVICE AND COMPLIANCE**

I hereby certify that the foregoing Memorandum in Support of Plaintiffs'
Motion for Partial Summary Judgment was filed electronically using the Court's
CM/ECF system, which provides electronic notice of the filing to all counsel of
record. Parties may access this filing through the Court's electronic filing system.

I further certify that the foregoing was prepared in compliance with LR 5.1
because it is typed in Times New Roman (14 point) font, and its top margin is not
less than one and one-half (1½) inches and left margin is not less than one (1) inch.

Dated this 17th day of January, 2020.         */s/ Omar Gonzalez-Pagan*
                                              Omar Gonzalez-Pagan
                                              LAMBDA LEGAL DEFENSE AND
                                              EDUCATION FUND, INC.
                                              120 Wall Street, 19th Floor
                                              New York, New York 10005
                                              ogonzalez-pagan@lambdalegal.org

40