# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

James Derek Mize, et al.

    *Plaintiffs*,

v.

Michael R. Pompeo, et al.,

    *Defendants*.

Civil Action No. 1:19-cv-3331-MLB

## SUPPLEMENTAL DECLARATION OF JAMES DEREK MIZE

I, James Derek Mize, hereby declare:

1. I am over 18 years of age. I have personal knowledge of the facts stated herein, except those stated on information and belief, and, if called upon, could and would testify competently to them. I submit this declaration in support of Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss (Docket No. 63).

2. I am a named plaintiff in this action, which I bring along with my husband Jonathan D. Gregg ("Jonny") and our infant daughter, whom I will refer to in this declaration by her initials "S.M.-G."

3. As noted in my declaration submitted in support of Plaintiffs' Motion for Partial Summary Judgment (Docket No. 45), which I incorporate by reference herein, the U.S. Department of State refused to recognize S.M.-G.'s U.S. citizenship by virtue of Section 301(c) of the Immigration and Nationality Act ("INA") on April

24, 2019. It did so notwithstanding that Jonny and I are married U.S. citizens, that we brought S.M.-G. into this world together as a married couple, that Jonny and I have both resided in the United States, and that we are S.M.-G.'s only parents.

4. The Department of State's refusal to recognize S.M.-G.'s U.S. citizenship, to treat me as S.M.-G.'s father for purposes of citizenship, and to recognize Jonny's and my marriage has been a constant source of stress and worry for our family. It has exacted a heavy psychological and financial toll on our family.

5. It also put us on a narrow path, with few options, to protect our family's integrity and our daughter.

6. After State Department employees at the London U.S. Embassy refused to recognize S.M.-G.'s U.S. citizenship on April 24, 2019, we flew back home to Atlanta on April 30, 2019. At the time, we were fearful that our daughter could be denied entry to the United States, given that border agents have discretion on whether to or not to allow our daughter to enter the country on a tourist visa.

7. On July 23, 2019, we commenced this litigation.

8. On July 29, 2019, our daughter's permission to be legally present in the United States expired.

9. We strive to follow the law and do what is right for our daughter. As such, S.M.-G.'s presence "out of status" in the United States has been a matter of great anxiety and concern.

10. We feared for S.M.-G.'s safety and security based on her "out of status" presence in the United States, as well as our ability to remain together as a family. We are cognizant of the current administration's willingness to deport children, break apart families, limit birthright citizenship, and even revoke naturalization in some circumstances.

11. In addition, S.M.-G.'s "out of status" presence meant that we could not travel outside the country with her for fear of her being denied reentry to the United States. This was of particular importance to us because Jonny's parents, who are S.M.-G.'s grandparents, are 76 and 81 years old; in poor health; and, as we learned later in the summer of 2019, physically too fragile to endure long-haul air travel.

12. It pained us to know we would be unable to visit Jonny's parents with S.M.-G. while she remained "out of status."

13. Based on our concern that S.M.-G.'s permission to be present in the United States had expired on July 29, 2019, our fear for what that meant while this case was pending, and the practical considerations of needing to be able to travel with her to visit family, we applied for lawful permanent residence (*i.e.*, a green card) for S.M.-G. in December 2019. We filed the application in order to be good parents to our daughter and caring sons to Jonny's parents.

14. The application was simply a stopgap measure, taken out of an abundance of caution, to ensure her lawful presence in the United States while this case was pending and to allow us to travel with her should the health of Jonny's parents further deteriorate. The pendency of S.M.-G.'s green card application gave her permission to be present in the United States. Although we should not have had to do this, we took the steps we thought were necessary to assure her safety and wellbeing while we continued to fight for recognition of her citizenship at birth.

15. When we filed our daughter's application for lawful permanent residence, we believed—and continue to believe now—that naturalization is not an adequate remedy for the discrimination we have faced and the rights denied to our daughter. S.M.-G. is a U.S. citizen by birth and ought to be entitled to all the benefits and rights that natural-born citizens have.

16. Aside from the indignity of having to take these steps, the process to apply for lawful permanent residence for S.M.-G. has been extremely costly and stressful. The filing fee for lawful permanent residence is $3,500, not including additional expenses for legal counsel and medical appointments. In total, we have spent over $6,000 on this temporary measure to ensure our daughter's ability to be lawfully present in her own home. We would not have incurred this cost had the State Department properly recognized S.M.-G. as a U.S. citizen by birth.

17. Filing the application for lawful permanent residence for S.M.-G. felt like an insult. It required me to be treated as her stepparent, even though I am her father and always have been. We have been with her since the moment she was born (and even before).

18. By notice dated April 27, 2020, a redacted version of which is attached as Exhibit A, U.S. Citizenship and Immigration Services approved S.M.-G.'s application for lawful permanent residence. To date, the State Department has not recognized S.M.-G. as a U.S. citizen, let alone a citizen by birth.

19. We believe there are important psychological and emotional differences between being a citizen since birth and being a naturalized citizen. As her parents, we are concerned about how we will answer the questions she might one day ask. If both her Daddy (me) and her Dadda (Jonny) are U.S. citizens, then why wasn't she when she was born?

20. Lastly, Jonny and I have begun the process to expand our family and provide S.M.-G. with a sibling. Concerns about whether another child of ours born abroad will be recognized as a U.S. citizen at birth has had an impact on how we are going about expanding our family. Couples in our situation should not have to worry about whose genetic material is used to bring children into our families.

21. Our daughter, S.M.-G., is and has always been a U.S. citizen by birth. Aside from the differences between birthright citizenship and naturalized citizenship, naturalization cannot undo the harm, humiliation, and distress caused by the State Department's refusal to treat S.M.-G. as our marital child, its disregard of Jonny's and my marriage, and its decision to ignore my role as S.M.-G.'s parent.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Decatur, Georgia this 19th day of June 2020.

James Derek Mize