# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

James Derek Mize and Jonathan
Daniel Gregg, individually and on
behalf of their minor child,
S.M.-G.,

                             Plaintiffs,

v.

Michael R. Pompeo, in his official
capacity as Secretary of State, and
the U.S. Department of State,

                             Defendants.

_____/

Case No. 1:19-cv-03331

Michael L. Brown
United States District Judge

## <u>OPINION & ORDER</u>

Plaintiffs James Derek Mize and Jonathan Daniel Gregg are U.S. citizens married to one another. In 2018, they had a child using Gregg's sperm, an anonymously donated egg, and a gestational surrogate. The child, Plaintiff S.M.-G., was born in England, and that country issued a birth certificate listing Mize and Gregg as S.M.-G.'s parents. The couple later applied for a U.S. passport and other proof of citizenship for their daughter. The U.S. Department of State ("State Department") denied

S.M.-G.'s applications, concluding she was not a U.S. citizen at birth because she shares a biological relationship with only one of her citizen parents (Gregg) who had not been physically present in the United States for long enough.  In doing so, the State Department treated S.M.-G. as if she had been born out of wedlock.

Plaintiffs filed suit challenging that determination and arguing the State Department's actions violate the Immigration and Nationality Act ("INA"), the Due Process Clause of the United States Constitution, and the Administrative Procedures Act ("APA").  Defendants Michael R. Pompeo and the State Department moved to dismiss for lack of jurisdiction or, in the alternative, for failure to state a claim.  (Dkts. 32; 63.)  The parties also cross-moved for partial summary judgment.  (Dkts. 44; 50.)  Having considered the issue, the Court denies Defendants' jurisdictional motion, partially grants and partially denies Defendants' motion to dismiss for failure to state a claim, grants Plaintiffs' summary judgment motion, and denies Defendants' summary judgment motion.

## I.    Background

### A.    The INA

"There are two sources of citizenship, and two only: birth and naturalization." *Miller v. Albright*, 523 U.S. 420, 423 (1998) (Stevens, J.). This case is about the former.   The Fourteenth Amendment confers citizenship on persons "born in the United States."   *Id.* at 423–24. Persons born abroad "acquire citizenship by birth only as provided by Acts of Congress." *Id.* at 424.

The INA is the primary Act of Congress governing birthright citizenship for foreign-born children.   It makes citizenship dependent upon the child's parents.   Section 301 provides "[t]he general rules for acquiring U.S. citizenship," and Section 309 provides the rules specifically applicable to children "born out of wedlock." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686–87 (2017); 8 U.S.C. §§ 1401, 1409.   The result is that Section 301 is necessarily limited to children born in wedlock.   *See Sessions*, 137 S. Ct. at 1686–87 (Section 301 is "[a]pplicable to married couples," whereas Section 309 "pertains specifically to children with unmarried parents").

3

Subsections (c) and (g) of Section 301 provide the rules most relevant to our case. They confer U.S. citizenship on:

> **(c)** a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;
>
> . . .
>
> **(g)** a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years[.]

8 U.S.C. §§ 1401(c), (g). Under these provisions, married parents who are both citizens pass citizenship to their child at birth so long as either parent had a residence in the United States (or an outlying possession) prior to the birth. On the other hand, if only one married parent is a citizen, that couple passes citizenship to their child at birth only if the citizen parent has lived in the United States (or an outlying possession) for at least five years.

In Section 309 (applicable to nonmarital children), the rules vary depending on whether citizenship is sought through the father or the

4

mother.   If citizenship is sought through the father, Section 309(a) incorporates Section 301's requirements and adds several other requirements of its own:

> **(a)** The provisions of paragraphs (c), (d), (e), and (g) of [Section 301] shall apply as of the date of birth to a person born out of wedlock if—
>
>> **(1)** a blood relationship between the person and the father is established by clear and convincing evidence,
>>
>> **(2)** the father had the nationality of the United States at the time of the person's birth,
>>
>> **(3)** the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and
>>
>> **(4)** while the person is under the age of 18 years—
>>
>>> **(A)** the person is legitimated under the law of the person's residence or domicile,
>>>
>>> **(B)** the father acknowledges paternity of the person in writing under oath, or
>>>
>>> **(C)** the paternity of the person is established by adjudication of a competent court.

*Id.* § 1409(a).  If citizenship is sought through the mother, Section 309(c) describes the rules that apply:

> Notwithstanding the provision of subsection (a) of this section, a person born, after December 23, 1952, outside the United States and out of wedlock shall be held to have

5

acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.

*Id.* § 1409(c).[1]

## B.   Defendants' Interpretation of the INA

The State Department has published a Foreign Affairs Manual ("FAM") that, together with other handbooks, forms "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures." (Dkts. 7 ¶ 24; 50-2 ¶ 42). The FAM "convey[s] codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive and Department mandates." (*Id.*) It is not, however, the product of notice-and-comment rulemaking, congressional action, or formal adjudication. (Dkts. 7 ¶ 25; 50-2 ¶¶ 38, 40.)

---

[1] The Supreme Court recently held that the relaxed residency requirement provided to citizen mothers in Section 309(c) violates citizen fathers' rights to equal protection. *See Sessions*, 137 S. Ct. at 1701. As a result, if the father is an alien, the unwed citizen mother must be physically present in the United States for *five* years as set forth in Section 301(g) rather than the *one* year as set forth in Section 309(c). *Id.*

The FAM describes the State Department's policy on the acquisition of birthright citizenship by children born abroad. The policy contains two key principles rooted in biology. The first says that foreign-born children cannot acquire birthright citizenship unless they share "a blood relationship [with] the parent(s) through whom citizenship is claimed." 8 FAM § 301.4-1(D)(1)(a); (*see* Dkt. 7 ¶¶ 27–28). The second says that children are "born out of wedlock" if their biological parents were unmarried at the time of birth; and that children are born "in wedlock" if their biological parents were married at the time of birth. 8 FAM § 304.1-2. Based on these principles, the State Department applies Section 301 to marital children only if they share a biological relationship with both parents. (Dkt. 7 ¶¶ 27–28.) Otherwise, the State Department applies Section 309, even though that provision is statutorily limited to children born "out of wedlock." (*Id.*); 8 U.S.C. § 1409. The result is that, under the State Department's interpretation, a child cannot acquire citizenship under Section 301(c) unless his or her parents are married U.S. citizens *and* he or she shares a biological relationship with both parents.

Of course, that interpretation leaves out many children born to U.S. citizens through assisted reproductive technology ("ART").  In 2014, the State Department modified its handbook to address that situation by providing that "a woman may establish a biological relationship with her child either by virtue of being the genetic mother (the woman whose egg was used in conception) or the gestational mother (the woman who carried and delivered the baby)."   8 FAM § 301.4-1(D)(1)(c).   No amendment to the INA triggered this change; the State Department simply altered its implementation of the statute.  As a result, when a U.S. citizen wife acts as a gestational mother for a donor egg fertilized by her citizen husband's sperm, the State Department now considers that child to have been born in wedlock of two citizens.  8 FAM §304.3-1(a)   And, when two married women who are citizens decide one of them will carry an egg donated from the other and fertilized by an anonymous sperm donor, the State Department reaches the same conclusion — that child is considered to have been born in wedlock of two U.S. citizens.  8 FAM §304.3-1(b).  In this latter instance, the State Department determines the child has a biological relationship with two women and totally ignores the citizenship of the sperm donor.   But, not two dads.   The State

Department says two married men can never have a child abroad that it considers having been born in wedlock.

### C. Defendants' Application of the INA to S.M.-G.

Mize and Gregg have been U.S. citizens since birth. (Dkts. 7 ¶¶ 10–11; 50-2 ¶¶ 1–2.) Mize was born in the United States and has lived here ever since. (Dkts. 7 ¶ 10; 45 ¶¶ 3–12.) Gregg was born in the United Kingdom but moved to the United States in 2014. (Dkts. 7 ¶¶ 10, 39; 46 ¶¶ 3–8.) The two met in 2014 and got married about a year later. (Dkts. 7 ¶¶ 39–40; 46 ¶¶ 5, 7.) When they decided to have a child using ART, they arranged for an anonymously donated egg to be fertilized with Gregg's sperm and implanted into a gestational surrogate who was a friend of theirs and lived in England. (Dkts. 7 ¶¶ 41–42; 50-2 ¶¶ 7, 9.) The surrogate gave birth to Mize and Gregg's daughter in England in 2018. (Dkts. 7 ¶¶ 42–45; 50-2 ¶¶ 9–10.)

In March 2019, a British court ordered that S.M.-G. "is to be treated in law as the child of the parties to a marriage, Jonathan Daniel Gregg and James Derek Mize." (Dkts. 7 ¶ 48; 50-2 ¶ 13.) The General Register Office of England also issued a birth certificate identifying S.M.-G.'s parents as Mize and Gregg. (Dkts. 7 ¶ 49; 50-2 ¶ 14.) This reflected the

understanding and intent of those involved in the ART process — Mize, Gregg, the surrogate, and the surrogate's husband — who all agreed before S.M.-G.'s conception that "Mize and Gregg would be the intended and only parents of any child born through the ART process." (Dkt. 50-2 ¶ 8; *see* Dkt. 7 ¶ 41.)

In April 2019, Plaintiffs went to the U.S. Embassy and applied for a Consular Report of Birth Abroad ("CRBA") and a U.S. passport for S.M.-G. (Dkts. 7 ¶ 52; 50-2 ¶ 23.) Both documents are proof of U.S. citizenship. (Dkt. 7 ¶ 26); 22 U.S.C. § 2705. The Embassy staff asked Mize and Gregg whose sperm was used to conceive S.M.-G. (Dkts. 7 ¶ 52; 50-2 ¶¶ 25–26.) Mize and Gregg explained the ART process, including telling the staff that Gregg had been the sperm provider. (*Id.*) The staff then evaluated S.M.-G.'s applications under INA Sections 309(a) and (by incorporation) 301(g), which together govern children "born out of wedlock" to one citizen parent and one alien parent. (Dkts. 7 ¶ 54; 50-2 ¶ 29.) The staff did this — instead of applying Section 301(c), which governs children with two married citizen parents — because S.M.-G. shares a biological relationship with Gregg but not Mize. (Dkts. 50 at 7; 50-2 ¶ 31.) The staff concluded that S.M.-G. is not a citizen under

Sections 309(a) and 301(g) and denied her applications for a CRBA and passport.  (Dkts. 7 ¶ 54; 7-1; 45-12; 50-2 ¶ 35.)[2]

There is no dispute that S.M.-G. does not qualify for citizenship under the INA provisions applied by the State Department (Sections 309(a) and 301(g)) as Gregg had not lived in the United States for five years prior to their daughter's birth.  But Plaintiffs say that — inasmuch as they are married to one another, are S.M-G.'s parents, and are both U.S. citizens — their daughter is a citizen under Section 301(c) and that the State Department should have applied that provision rather than the "born out of wedlock" provision.

### D.   Procedural History

Plaintiffs filed this lawsuit in July 2019, asserting four claims against Defendants.  (Dkts. 1; 7.)  Count 1 seeks a declaration that S.M.-G. "is a national and citizen of the United States who acquired citizenship at birth by operation of Section 301(c) of the INA."  (Dkt. 7 ¶ 69.)  Count 2 asserts a substantive due process claim under the Fifth

---

[2] Specifically, the State Department found that S.M.-G.'s only "biological U.S. citizen parent [Gregg] was not physically present in the United States for five years prior to the child's birth . . . as required under the provisions of section 301(g) of [INA]."  (Dkt. 7-1.)

Amendment.  Specifically, Plaintiffs say Defendants' refusal to recognize S.M.-G.'s citizenship (1) "violated Mize and Gregg's fundamental right to marry," including their right to the marriage-linked benefits available to opposite-sex spouses; and (2) "violated all Plaintiffs' fundamental rights to be recognized as a family, including the rights to family privacy, integrity, and association."  (Dkts. 7 ¶¶ 70–81; 35-1 at 12.)   Count 3 asserts a Fifth Amendment equal protection claim on the grounds that Defendants (1) regard the children of same-sex spouses as "born out of wedlock"; (2) prevented Mize and Gregg from conferring citizenship on their child under Section 301(c) because of their sex and sexual orientation; and (3) prevented S.M.-G. from acquiring citizenship under Section 301(c) "because of the circumstances of [her] birth and because of [her] parents' sexual orientation, sex, and/or status as a same-sex married couple."  (Dkt. 7 ¶¶ 84–88.)   Count 4 asserts an APA claim for judicial review of Defendants' denial of S.M.-G.'s applications.  (*Id.* ¶ 92.)

The complaint requests four forms of relief:  (1) a declaration that S.M.-G. is a U.S. citizen under Section 301(c); (2) an order requiring Defendants to issue a U.S. passport to S.M.-G.; (3) a declaration that Defendants' "policy and practice" towards the children of married same-

12

sex couples is unconstitutional and a violation of the INA; and (4) a permanent injunction enjoining Defendants from continuing to apply that policy and practice.  (*Id.* at 31–32.)

In November 2019, Defendants moved to dismiss the complaint for failure to state a claim.  (Dkt. 32.)  The parties then cross-moved for summary judgment on Plaintiffs' INA claim (Count 1).  (Dkts. 44; 50.) A few months later and following oral argument, Defendants filed a motion to dismiss for lack of subject matter jurisdiction.   (Dkt. 63.) Defendants claim this case is now moot because, under  8 U.S.C. § 1431(a), S.M.-G. automatically became a naturalized U.S. citizen when she obtained lawful permanent resident status earlier this year.

## II.   **Subject Matter Jurisdiction**

### A.   **Legal Standard**

"[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint."   *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).  "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and

the allegations in his complaint are taken as true for the purposes of the motion." *Id.* "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* Defendants lodge a factual attack here because they say "events occurring after [Plaintiffs] initiated this action have rendered it moot." *Thomas v. Branch Banking & Tr. Co.*, 32 F. Supp. 3d 1266, 1268 (N.D. Ga. 2014).

Article III of the Constitution limits the subject matter jurisdiction of federal courts to "actual, ongoing cases or controversies." *Checker Cab Operators, Inc. v. Miami-Dade Cty.*, 899 F.3d 908, 915 (11th Cir. 2018). To invoke this jurisdiction, "a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The required injury "must be extant at all stages of review, not merely at the time the complaint is

14

filed." *Checker Cab Operators*, 899 F.3d at 915. "If the injury ceases, or is rendered unamenable to judicial relief, then the case becomes moot and thereby incapable of further Article III adjudication." *Id.*[3]

"Thus, even a once-justiciable case becomes moot and must be dismissed when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017). Put another way, "[i]f events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001); *see Flanigan's Enters.*, 868 F.3d at 1264 ("[A] previously justiciable case is moot when the requested relief, if granted, would no longer have any practical effect on the rights or obligations of the litigants."). "[D]ismissal

---

[3] The "case or controversy" requirement abides the limited role of the courts in a democratic society. *Warth v. Seldin*, 422 U.S. 490, 498, (1975). "All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010).

is required because mootness is jurisdictional." *Al Najjar*, 273 F.3d at 1336. "The burden of establishing mootness rests with the party seeking dismissal." *World Wide Supply OU v. Quail Cruises Ship Mgmt.*, 802 F.3d 1255, 1259 (11th Cir. 2015).

## B.   Discussion

The parties agree that S.M.-G. is now a naturalized U.S. citizen under 8 U.S.C. § 1431(a). (Dkts. 63 at 1; 74 at 5.) Defendants say this "resolves Plaintiffs' alleged harms" and moots the case. (Dkt. 63 at 2.) The Court disagrees.

"Plaintiffs have relied upon the same underlying injuries for all of their claims." (Dkt. 69; *see* Dkt. 74 at 16, 41.) Those injuries include stigmatization based on Defendants' failure to recognize S.M.-G.'s birthright citizenship under Section 301(c) of the INA. (*Id.*) In particular, Plaintiffs claim Defendants "stigmatize[d] and demean[ed] the Mize-Gregg family [and each of its members] by refusing to recognize and give effect to Mr. Mize and Mr. Gregg's marriage, denying the reality of the father-daughter relationship between [S.M.-G.] and both of her fathers, labeling S.M.-G. a non-marital child, . . . singling the family out for government-sponsored discrimination, . . . [and] unlawfully den[ying]

16

that the Mize-Gregg family is a family at all." (Dkt. 7 ¶ 8; *see id.* ¶¶ 6, 60.) The fact that S.M.-G. is now a naturalized citizen under another statute changes none of these things. Defendants still insist S.M.-G. is not a citizen under Section 301(c) of the INA for the same reasons as before. And any stigmatization flowing from that determination necessarily still exists. Because S.M.-G.'s naturalization does not erase Plaintiffs' alleged stigmatic injury, it cannot moot the case.

To the extent Defendants claim Plaintiffs' "stigma is not a cognizable Article III injury," (Dkt. 67 at 12), that is a standing argument rather than a mootness argument because it does not depend on anything that has happened since this lawsuit was filed. *See A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1213 n.2 (11th Cir. 2019) ("The Supreme Court has described mootness as merely the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."). But however the argument is characterized, and whether or not it was appropriately asserted in a mootness motion, it is wrong on the merits. "[S]tigmatic injury, though not sufficient for standing in the abstract form . . . , is

judicially cognizable to the extent that [plaintiffs] are personally subject to discriminatory treatment." *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). "A plaintiff alleging a stigmatic injury based on discrimination must point to some concrete interest with respect to which he [or she] is personally subject to discriminatory treatment and that interest must independently satisfy the causation requirement of standing doctrine." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019).

*Heckler v. Mathews*, 465 U.S. 728 (1984), offers a good example of a judicially cognizable stigmatic injury. That case involved a statute allowing men to obtain spousal benefits only if they were economically dependent on their wives. Women, on the other hand, could obtain the same benefits without showing economic dependence on their husbands. Plaintiff, a married man, applied for benefits under the statute. His application was denied because he was not economically dependent on his wife. *Id.* at 735. He sued, seeking a declaratory judgment that the statute violated the Due Process Clause of the Fifth Amendment. *Id.* The Court held that he had standing to seek this prospective relief

18

because he was "personally denied equal treatment," which entailed "serious non-economic injuries" including stigmatization. *Id.* at 738–40. The Court stressed that "because [plaintiff] personally has been denied benefits that similarly situated women receive, his is not a generalized claim of the right possessed by every citizen, to require that the Government be administered according to law." *Id.* at 740 n.9.[4]

*Allen v. Wright*, 468 U.S. 737 (1984), offers a useful counterpoint because it involves the kind of "generalized" stigmatic injury the *Heckler* Court warned against. The plaintiffs in *Allen* were parents of black children who attended public school. They sued the Internal Revenue Service ("IRS"), claiming it was granting tax-exempt status to racially discriminatory private schools. *Allen*, 468 U.S. at 739. Plaintiffs sought declaratory and injunctive relief. *Id.* at 746–47. Plaintiffs' children had never applied to, or been excluded from, private school. *Id.* at 746. Nor was there any allegation that they ever would. *Id.* But Plaintiffs claimed they had standing because the IRS's favorable treatment of racially

---

[4] The *Heckler* Court upheld standing even though (1) the court could not actually *grant* spousal benefits to plaintiff if he prevailed (all it could do was *withdraw* those benefits from similarly situated women), and (2) the court ultimately denied plaintiff's claim on the merits (finding no equal protection violation). *Heckler*, 465 U.S. at 738–39, 744–51.

discriminatory private schools caused plaintiffs the kind of "stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race." *Id.* at 754.

The Court held that this "abstract stigmatic injury" was insufficient because plaintiffs did not show they suffered it "as a direct result of having personally been denied equal treatment." *Id.* at 755–56. If plaintiffs' injury were cognizable, the court said, "[a] black person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine" — a result that "would transform the federal courts into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Id.* at 756. Citing *Heckler*, the Court reiterated that "stigmatic injury . . . . accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Id.* at 755.[5]

---

[5] The Court also cited other cases in which "plaintiffs alleged official racial discrimination" but in which "standing was denied . . . because the plaintiffs were not personally subject to the challenged discrimination." *Allen*, 468 U.S. at 755. In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), for example "the Court held that the plaintiff had no standing to challenge a club's racially discriminatory membership policies because he had never applied for membership." *Allen*, 468 U.S. at 755. Likewise, in *O'Shea v. Littleton*, 414 U.S. 488 (1974), "the Court held that the

Our case is more like *Heckler* than *Allen* because Plaintiffs'
stigmatic injury flows from alleged discriminatory treatment to which
Plaintiffs were personally subject.  Unlike *Allen*, Plaintiffs here are not
mere "bystanders" concerned about Defendants' treatment of others with
whom they share no connection beyond common membership in a
disfavored group.  *Allen*, 468 U.S. at 756.  That is, Plaintiffs do not allege
"dignitary harm stemming from the mere knowledge that discriminatory
conduct is" happening to *someone else*.  *Carello v. Aurora Policemen
Credit Union*, 930 F.3d 830, 834 (7th Cir. 2019).

Instead, Defendants rejected *Plaintiffs'* applications for citizenship
documents, declined to recognize *S.M.-G.* as a citizen from birth, and
denied *Mize and Gregg's* attempt to confer citizenship on their child —
and did so allegedly because S.M.-G. is the child of same-sex male
parents.  *See Church of Scientology Flag Serv. Org., Inc. v. City of
Clearwater*, 2 F.3d 1514, 1525 (11th Cir. 1993) (recognizing that
"stigmatic injury associated with invidious official conduct is cognizable

---

plaintiffs had no standing to challenge racial discrimination in the
administration of their city's criminal justice system because they had
not alleged that they had been or would likely be subject to the challenged
practices."  *Allen*, 468 U.S. at 755.

for standing purposes if the plaintiff is *directly affected*" (emphasis added)). Plaintiffs further allege that these actions — both directed at and felt by them personally — "stigmatize[d] and demean[ed] the Mize-Gregg family" in a variety of ways. (Dkt. 7 ¶ 8; *see id.* ¶¶ 6, 60.)

In sum, Plaintiffs say Defendants prevented them from acquiring or conferring birthright citizenship, and that this "personally subject[ed]" them to discrimination and stigmatization. They have alleged an actual, palpable stigmatic injury resulting from Defendants' conduct rather than merely a theoretical or abstract injury. That is enough for Article III standing. *See, e.g.*, *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (finding that plaintiffs' "stigmatic injuries are legally cognizable" because they flowed from allegedly discriminatory laws that impacted them personally, including by hindering their hospital visits and preventing them from adopting a child). Defendants' mootness motion is thus denied.

## III.   Legal Standards for the Merits Motions

### A.    Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Id.* This requires more than a "mere

possibility of misconduct." *Id.* at 679. A plaintiff's well-pled allegations

must "nudge[] [his] claims across the line from conceivable to plausible."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In making this plausibility determination, the court must "assume

that the factual allegations in the complaint are true and give the

plaintiff[] the benefit of reasonable factual inferences." *Wooten* v.

*Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010). The court

need not credit "conclusory allegations, unwarranted deductions of facts

or legal conclusions masquerading as facts." *Jackson v. BellSouth*

*Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004); *see Twombly*, 550 U.S.

at 555 ("labels and conclusions" are disregarded, and "formulaic

recitation[s] of the elements of the cause of action" are insufficient).

**B.    Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that a court

"shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if "it might affect the outcome of the suit under the governing law." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 1361.

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48.

Throughout its analysis, the court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

## IV.   Plaintiffs' INA Claim (Count 1)

In Count 1, Plaintiffs seek a declaration that S.M.-G. is a U.S. citizen under Section 301(c) of the INA. That provision confers citizenship at birth on "a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person." 8 U.S.C. § 1401(c). There is no dispute that S.M.-G. is a citizen under this language unless it requires her to share a biological relationship with both citizen parents. (*See* Dkt. 53 at 3.) Defendants say that Section 301(c) does require such a relationship (the "Biological Reading"). Plaintiffs disagree (the "Non-Biological Reading"). The Court concludes

that the Non-Biological Reading must prevail under the doctrine of constitutional avoidance.

## A.     Constitutional Avoidance

The doctrine of constitutional avoidance is a "cardinal principle" of statutory interpretation. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018).  It provides that, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, [courts] are obligated to construe the statute to avoid such problems." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299–300 (2001).  "This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998).  "The doctrine seeks, in part, to minimize disagreement between the branches," *id.*, and "reflects the prudential concern that constitutional issues not be needlessly confronted," *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988).

The problematic construction need only "give rise to serious constitutional questions," *N.L.R.B. v. Catholic Bishop of Chicago*,

440 U.S. 490, 501 (1979), "grave doubts," *Chapman v. United States*, 500 U.S. 453, 464 (1991), or a "serious likelihood" of unconstitutionality, *Almendarez-Torres*, 523 U.S. at 238. A finding of actual unconstitutionality is not required. *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score."). "Indeed, one of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions." *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *see Cable Holdings of Ga., Inc. v. McNeil Real Estate Fund VI, Ltd.*, 953 F.2d 600, 610 (11th Cir. 1992) ("[T]he canon of statutory interpretation . . . seeks to avoid constitutional difficulties").

If one construction of a statute raises serious constitutional questions, courts must adopt an alternative construction so long as it is "plausible," "fairly possible," or "reasonable." *Jennings*, 138 S. Ct. at 842; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) (Roberts, C.J.). This may require courts to adopt a particular construction "even if [they] might prefer another one." *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1221 (11th Cir. 2009). That is so because

"[d]eciding how best to construe statutory language is not the same thing as deciding whether a particular construction is within the ballpark of reasonableness." *Id.*  Ultimately, "[t]he question is not whether [a saving construction] is the most natural interpretation . . . , but only whether it is a fairly possible one."  *Sebelius*, 567 U.S. at 563 (Roberts, C.J.); *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 18 (2013) (under the constitutional avoidance doctrine, courts "have to determine whether [a saving] interpretation, [even if] plainly not the best reading, is at least a possible one"); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) ("[W]hen one admissible construction will preserve a statute from unconstitutionality and another will condemn it, the former is favored even if language, and arguably the legislative history point somewhat more strongly in another way.").

Nonetheless, courts "cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question." *Salinas v. United States*, 522 U.S. 52, 60 (1997).  The statute must be genuinely ambiguous, or "susceptible of more than one construction," "after the application of ordinary textual analysis."  *Jennings*, 138 S. Ct. at 842; *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483,

494 (2001); *Almendarez-Torres*, 523 U.S. at 238.  If a constitutionally permissible construction is "foreclosed" by the statutory text, or "plainly contrary to the intent of Congress," the court cannot adopt it.  *Edward J. DeBartolo*, 485 U.S. at 575, 588; *see Aptheker v. Sec'y of State*, 378 U.S. 500, 515 (1964) ("[A]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute or judicially rewriting it.").

## B.   The   Biological   Reading   Would   Raise   Serious Constitutional Questions

"[T]he Constitution entitles same-sex couples to civil marriage on the same terms and conditions as opposite-sex couples." *Pavan v. Smith*, 137 S. Ct. 2075, 2076 (2017).  This includes equal access not just to the "symbolic recognition" of marriage but also to the "material benefits" that come with it.  *Obergefell v. Hodges*, 576 U.S. 644, 669 (2015).  These benefits arise in numerous areas, including "taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decision-making authority; adoption rights; the rights and benefits of survivors; birth and death certificates; professional   ethics   rules;   campaign   finance   restrictions;   workers'

29

compensation benefits; health insurance; and child custody, support, and visitation rules." *Id.* at 670.  Ultimately, the government cannot "den[y] married same-sex couples access to the constellation of benefits that the State has linked to marriage," whatever those benefits might be. *Pavan*, 137 S. Ct. at 2078.

*Pavan* illustrates this principle well.  It involved an Arkansas statute that required the state to list a mother's husband on her child's birth certificate, regardless of the husband's biological relationship with the child.  If the mother was in a same-sex marriage, however, the state was not required to list her wife on the birth certificate.  The Court said this "disparate treatment" was unconstitutional because the "right . . . to be listed on a child's birth certificate" was (1) a benefit, (2) conditioned on marriage, (3) that was unavailable to married same-sex couples.  *Id.* at 2078–79.  The Court stressed that the "State may not exclude same-sex couples from [marriage-linked] rights, benefits, and responsibilities to which [they], no less than opposite-sex couples, must have access." *Id.* at 2078.

*In re Gestational Agreement*, 449 P.3d 69 (Utah 2019), offers another useful example of the constitutional right to equal marital

benefits for same-sex couples.[6]  That case involved a statute which authorized gestational surrogacy agreements only if certain conditions were met.  Two conditions were that (1) the intended parents were married and (2) "the intended mother is unable to bear a child or is unable to do so without unreasonable risk."  *Id.* at 72, 82 & n.69.  The court said the statute was unconstitutional under *Pavan* because (1) the ability to obtain a gestational agreement was a "benefit"; (2) the statute "unquestionably linked" that benefit to marriage by making it unavailable to unmarried couples; and (3) it was "impossible for married same-sex male couples" to obtain this benefit because their relationships could never include an "intended mother" (*i.e.*, a "female parent").  *Id.* at 80, 82.  The court reached this conclusion even though the benefit was available to some same-sex female couples and unavailable to some opposite-sex couples (depending on whether the intended mother in those relationships was able to bear a child).  "Because [the statute] work[ed] to deny certain same-sex couples a marital benefit freely accorded to

---

[6] Although *Gestational Agreement* is not binding, the implications of *Pavan* have been examined by only a handful of federal courts, none of which are in the Eleventh Circuit.  So *Gestational Agreement* is one of the few aids out there.  The Court also finds it both analogous and persuasive.

opposite-sex couples, it [was] unconstitutional under *Obergefell* and *Pavan*." *Id.* at 82.

These cases raise serious doubts about the constitutionality of a biological parent-child requirement in Section 301(c). That provision allows married U.S. citizens to confer birthright citizenship on their foreign-born children if either spouse resided previously in the United States for any length of time. The ability to confer citizenship under these circumstances, without the additional burdens imposed by other provisions, could reasonably be viewed as a "benefit." That benefit is "linked to marriage" because it is unavailable to unmarried couples. And, under the Biological Reading, Section 301(c) would preclude married same-sex male couples from accessing this benefit because it is "impossible" for two men to be related biologically to the same child. *Gestational Agreement*, 449 P.3d at 82; (*see* Dkt. 74 at 33–34).[7]

Thus, as in *Pavan* and *Gestational Agreement*, the Biological Reading would result in a statute that (1) provides a benefit,

---

[7] It would likely exclude same-sex female couples as well since it is not clearly established that two females can share a biological relationship to the same child. *But see Henderson v. Box*, 947 F.3d 482, 486–87 (7th Cir. 2020) (suggesting birth mother of donor egg considered biological

(2) conditioned on marriage, (3) that is unavailable to certain married same-sex couples.  As in *Pavan* and *Gestational Agreement*, this would "den[y] married same-sex couples access to the constellation of benefits that the State has linked to marriage."  *Pavan*, 137 S. Ct. at 2078.  And, as in *Pavan* and *Gestational Agreement*, that would likely render the statute unconstitutional.  Indeed, another court reached exactly this conclusion just two months ago.  *See Kiviti v. Pompeo*, 2020 WL 3268221, at *13 (D. Md. June 17, 2020) ("The fact that, under the State Department's interpretation, a male same-sex married couple can never have a child deemed to be born in wedlock and receive the citizenship-related benefit associated with having such a marital child alone raises serious doubts whether it infringes on th[eir] fundamental right.").

Because the Biological Reading would "raise[] a serious doubt" about the constitutionality of Section 301(c), "th[e] Court will first ascertain whether a construction of the statute is fairly possible by which

---

parent).  Defendants do say a *gestational* mother counts as a biological parent under Section 301(c), even if she lacks a genetic relationship to the child.  But that is a contorted position that strains the statutory text at issue here and, even if right, would not change the provision's exclusion of same-sex male parents.  Indeed, it would only amplify the unfair denial of equal treatment to couples like Mize and Gregg.

the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689–90 (2001) (finding that one construction "would raise a serious constitutional problem" before determining whether another construction was possible). In other words, the Court must consider whether the Non-Biological Reading is plausible and, if it is, the Court must adopt it.

### C.   The Non-Biological Reading is Plausible

#### 1.   Ordinary Meaning

"As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1215 (11th Cir. 2015).   Section 301(c) grants citizenship to a person "born . . . of parents both of whom are citizens of the United States." 8 U.S.C. § 1401(c).  The INA does not define "born" or "of."  Nor does it define the word "parents," beyond clarifying that it includes deceased parents.  8 U.S.C. § 1101(c)(2).  Everyone agrees, however, that S.M.-G. was "born" and that Mize and Gregg are her "parents."  (*See, e.g.*, Dkts.

42 at 1–2, 8; 50 at 2, 31.)[8]  So the central question is whether she was born "of" those parents.

Because the word "of" is not defined in the statute, it "must be given [its] ordinary or common, everyday meaning[]." *United States v. Caniff*, 955 F.3d 1183, 1187–88 (11th Cir. 2020); *see Animal Legal Def. Fund*, 789 F.3d at 1216 ("In the absence of a statutory definition, we look to the common usage of words for their meaning.").  "To determine the ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *Castillo v. U.S. Atty. Gen.*, 756 F.3d 1268, 1273 (11th Cir. 2014).  The INA was enacted in 1952, so dictionaries from that time provide the best guidance.  *See Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190 (11th Cir. 2019) ("[W]e interpret the words of a statute based on their meaning at the time of enactment."); *Animal Legal Def. Fund*, 789 F.3d at 1216 n.8 ("We have chosen to use a 1976 dictionary

---

[8] The latter conclusion follows from Defendants' position that, in Section 301, the word "parents" refers to *legal* parents.  (*See* Dkts. 42 at 8–9; 50 at 2, 19–20); *see also E.J. D.-B. v. U.S. Dep't of State*, Case No. 19-55517, Dkt. 37, at 8 (9th Cir. Feb. 3, 2020) (noting "the Department's interpretation of [Section 301], under which citizenship turns *both* on who a child's legal 'parents' are *and* on whether the child was 'born . . . of' those parents.").

because it is more contemporaneous to the 1966 enactment of the [statute] than a modern edition.").

Dictionaries from around that time include several definitions of the word "of." The one that counts most, of course, is the one "linguistically relevant to the circumstances here." *Id.* at 1216. That definition reads: "Indicating origin, source, or the like." Webster's New International Dictionary 1689 (2d ed. 1958) ("Webster's"). The Oxford English Dictionary — "one of the most authoritative on the English language," *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 569 (2012) — provides a similar definition: "Of *origin* or *source*. Indicating the thing or person whence anything originates, comes, is acquired or sought." Oxford English Dictionary, Vol. VII, at 67 (1st ed. 1933) ("1933 OED").[9] A person is thus born "of" parents who are U.S. citizens if he or she "originated" from those parents.

There is no doubt that this language can be read narrowly to refer specifically to a biological parent-child relationship. *See, e.g., United States v. Marguet-Pillado*, 560 F.3d 1078, 1083 (9th Cir. 2009) ("There

---

[9] This definition is unchanged in the 1989 version of the Oxford English Dictionary. Oxford English Dictionary (2d ed. 1989) ("1989 OED"), *available at* https://oed.com/oed2/00162372.

can be little doubt that the 'born of' concept generally refers to a blood relationship."). The concept of origination, when used "[i]n reference to a person," generally denotes "[t]he fact of springing from some particular ancestor or race; descent, extraction, parentage, ancestry." 1933 OED, Vol. VII, at 202.[10] And the word "of," when it follows the word "born," commonly "express[es] racial or local origin, descent, etc." *Id.* at 67.[11] These definitions have strong biological connotations.

But the statutory phrase can also be read more broadly. As the Oxford English Dictionary points out, the meaning of the word "of" has been "so weakened down" over time that it now often "express[es] . . . the vaguest and most intangible of relations." 1933 OED, Vol. VII, at 66.[12] In the face of this dilution, reading a narrow biological requirement into the word may place more weight on it than it can bear.

Moreover, the concept of origination is "not necessarily" limited to biological origination, even if it is often used that way in reference to a person. *Zadvydas*, 533 U.S. 678, 697 (finding a word "ambiguous" because it did "not necessarily suggest" only one meaning). It can also

---

[10] *See* 1989 OED, *available at* https://oed.com/oed2/00164865 (same).

[11] *See* 1989 OED, *available at* https://oed.com/oed2/00162372 (same).

[12] *See* 1989 OED, *available at* https://oed.com/oed2/00162372 (same).

refer more generally to "[t]he act or fact of arising or springing from something" or to an entity's "beginning of existence in reference to its source or cause."  1933 OED, Vol. VII, at 202;[13] *see* Webster's at 1720 (defining "origin" as "[t]he fact or process of coming into being from a source; derivation; beginning regarded in connection with its cause"); *id.* at 1721 (defining "originate" as "to give an origin or beginning to," "to bring into existence," "[t]o take or have origin," or "to begin to exist or act").

Under this broader meaning, "[a] child could fairly be deemed to originate from parents other than through a genetic relationship, such as where two married parents both play a fundamental and instrumental role in the creation of the child, for example by, as here, together planning and supporting the use of surrogacy and ART to bring about the birth of a child to whom they have both committed in advance to be a parent." *Kiviti*, 2020 WL 3268221, at *10.  This application of the origination concept is consistent with "ordinary speech" and is not foreclosed by the statute, which imposes no textual limitation on the kind of origination it will accept.  *McBoyle v. United States*, 283 U.S. 25, 26 (1931) (adopting

---

[13] *See* 1989 OED, *available at* https://oed.com/oed2/00164865 (same).

the meaning assigned to a word "in everyday speech," even though "[n]o doubt etymologically it is possible to use the word to signify" something else); *see Watson v. United States*, 552 U.S. 74, 79 (2007) ("With no statutory definition or definitive clue, the meaning of the [word] has to turn on the language as we normally speak it . . . .   So . . . we look[] for everyday meaning revealed in phraseology that strikes the ear as both reasonable and normal.").

Perhaps most tellingly, Defendants explicitly concede that, with respect to whether "born of parents" requires a biological relationship, "a reasonable person could read the language either way."  (Dkt. 42 at 6.)[14]  That is the very definition of ambiguous.  *See Med. Transp. Mgmt. Corp. v. Comm'r of I.R.S.*, 506 F.3d 1364, 1368 (11th Cir. 2007) ("Statutory language is ambiguous if it is susceptible to more than one

---

[14] Indeed, although Defendants briefly make an "ordinary meaning" argument in their opening motion to dismiss brief, they concede in their reply brief that the argument is not decisive and they omit it altogether from their summary judgment brief.  (*See* Dkts. 32-1 at 19; 42 at 6; 50; 53 at 4.)  Defendants have also conceded, in a recent court filing in another case, that Section 301 does not "provide[] an unambiguous textual answer to the question . . . whether a child must be biologically related to his parents in order to acquire citizenship from them." *E.J. D.-B. v. U.S. Dep't of State*, Case No. 19-55517, Dkt. 37, at 4–5 (9th Cir. Feb. 3, 2020).

reasonable interpretation."). Defendants' actions confirm that ambiguity. As mentioned above, in 2014, the State Department decided that a child could be "born of" (*i.e.*, biologically related to) a gestational mother who is not genetically related to the child. (*See* Dkt. 50-2 ¶¶ 54–55.) Before that time, Defendants reached the opposite conclusion. No amendment to the statute triggered this change; Defendants just read the language differently. This policy change, untethered to anything else, only underscores the "elasticity" of the "born of" language. *Kiviti*, 2020 WL 3268221, at *10.

In sum, the ordinary meaning of the statutory phrase, "born of parents," is reasonably consistent with both the Biological Reading and the Non-Biological Reading.

## 2. Statutory Context

The Court next considers the INA's statutory context to see if it affects the plausibility of the Non-Biological Reading. *See Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1267–68 (11th Cir. 2006) ("[I]n order to determine the plain meaning of the statute we must consider both the particular statutory language at issue and the language

and design of the statute as a whole.").  For at least three reasons, the Court finds that the construction remains plausible.

First, Defendants do not dispute that Section 301(c) incorporates "the cluster of ideas" attached to the word "parents" under the common law, including the common law presumption of legitimacy.  *Carter v. United States*, 530 U.S. 255, 264 (2000) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to [it].");  (*see* Dkt. 50 at 19–20).[15]  That presumption, which is "universally recognized," is "a fundamental principle of the common law."  *Michael H. v. Gerald D.*, 491 U.S. 110, 124 (1989);  *Ray v. Bryant*, 411 F.2d 1204, 1205 (5th Cir. 1969).  Moreover, it "effectively consider[s] a child to be *born of* parents consisting of a biological parent and that parent's spouse at the time of the birth, without requiring proof that the spouse ha[s] a genetic relationship with the child."  *Kiviti*, 2020

---

[15] *See N.L.R.B. v. Amax Coal Co., a Div. of Amax*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.").

WL 3268221, at *9 (emphasis added).[16]    Given that Section 301(c) incorporates this presumption, it can plausibly be read to cover children who, like S.M.-G., are related biologically to only one of their married parents.  *See Jaen v. Sessions*, 899 F.3d 182, 185 (2d Cir. 2018) ("[T]he INA incorporates the common law meaning of 'parent' into [Section 301], such that a child born into a lawful marriage is the lawful child of those parents, regardless of the existence or nonexistence of any biological link.").

Second, Section 309(a)(1) expressly includes a "blood relationship" requirement while Section 301(c) does not.  This suggests that Congress knew how to require a biological relationship and that it intentionally declined to do so in Section 301(c).  *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act,

---

[16] The presumption applies even if the married couple are the same sex. *See Henderson*, 947 F.3d at 487 ("[A] state cannot presume that a husband is the father of a child born in wedlock, while denying an equivalent presumption to parents in same-sex marriages."); *Kiviti*, 2020 WL 3268221, at *9 ("[C]ourts have extended the presumption that a person is the legal parent of a child based on marriage to a biological parent at the time of birth to same-sex marriages."); *McLaughlin v. Jones in & for Cty. of Pima*, 401 P.3d 492, 498 (Az. 2017) ("[T]he presumption of paternity . . . cannot . . . be restricted to only opposite-sex couples.").

it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). That inference is bolstered by the fact that Congress added the "blood relationship" language in a 1986 amendment that also made unrelated changes to Section 301. *See* Pub. L. No. 99-653, §§ 12–13, 100 Stat. 3655. That Congress considered changes to both sections at the same time but inserted the 'blood relationship' requirement only in Section 309 strongly suggests Section 301 contains no such requirement.[17]

Third, and relatedly, if Congress wanted to require a biological parent-child relationship, "it certainly could have spoken in clearer terms." *Zadvydas*, 533 U.S. at 697 (finding the word "may" to be ambiguous because it could refer to limited or unlimited discretion and, if Congress had wanted to authorize the latter, "it certainly could have spoken in clearer terms"). The idea that Congress used a vague, two-letter preposition to implicitly incorporate such a weighty

---

[17] The argument is not a slam dunk, however, because the Supreme Court has suggested that other INA provisions (Sections 309(a)(4) and 309(c)) require a biological relationship even though they lack any "blood relationship" language. S*ee Nguyen v. I.N.S.*, 533 U.S. 53, 62–64 (2001); *Miller*, 523 U.S. 433–38 (1998) (Stevens, J.); *see also Marguet-Pillado*, 560 F.3d at 1083 (finding that "the 1952 version [of Section 309(a)] still required a biological relationship" even though it did not do so expressly).

43

requirement is in tension with the canon that Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague or ancillary provisions.").[18]

### 3.    Other Cases

At least six cases have held that Section 301 does not require a biological parent-child relationship.[19]    No court has expressed the

---

[18] Curiously, Section 301 sometimes says born "to" instead of born "of." *See* 8 U.S.C. § 1401(b).    Courts generally presume that "differing language" does not convey "the same meaning." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see Russell v. Law Enf't Assistance Admin. of U. S.*, 637 F.2d 354, 356 (5th Cir. 1981).    But Plaintiffs and Defendants both claim that rule does not apply here. (Dkt. 74 at 46–50.)    Defendants say each phrase requires a biological relationship; Plaintiffs say neither phrase does. (*Id.*)    In the Court's view, "born to" seems less susceptible to a narrow biological meaning than "born of." *See* 1933 OED, Vol. XI, at 86 (defining "to" as "[i]ntroducing the recipient of anything given, or the person or thing upon whom or which an event acts or operates," *e.g.*, "[h]aving a Son born to him"); 1989 OED, *available at* https://oed.com/oed2/00253634 (same); Webster's at 2657 (defining "to" as "[i]ndicating the recipient affected by action," *e.g.*, "a son born to them"). But, given the parties' limited submissions on this issue (they only addressed it briefly in response to a direct question at oral argument), the Court cannot say that the statute's use of both phrases sheds conclusive light on the meaning of either.

[19] *See Jaen*, 899 F.3d at 190 ("[A] blood relationship is not required to establish parentage for purposes of acquired citizenship [under Section 301] when the child is born into marriage."); *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005) (finding that a child who lacked a

contrary view.[20]   That is not dispositive, of course, but it certainly supports the conclusion that the Non-Biological Reading is a reasonable one.  *See In re Aldersgate Found., Inc.*, 878 F.2d 1326, 1328 n.3 (11th Cir. 1989) ("Decisions of other courts support our interpretation of the [statutory] term."); *see also Guar. Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 1004 n.3 (11th Cir. 1991) ("That the various courts that have already decided this question are split supports our conclusion that the statute is ambiguous.").

---

biological relationship with his only citizen parent was nevertheless a citizen under Section 301(g)); *Scales v. I.N.S.*, 232 F.3d 1159, 1164 (9th Cir. 2000) ("A straightforward reading of § 1401 indicates . . . there is no requirement of a blood relationship"); *Kiviti*, 2020 WL 3268221, at *11 ("[T]he statute is clear and unambiguous that the phrase 'born . . . of parents' in 8 U.S.C. § 1401(c) does not require a biological relationship with both parents."); *Sabra as next friend of Baby M v. Pompeo*, 2020 WL 1643676, at *20 (D.D.C. Apr. 2, 2020) ("[T]he plain language of 8 U.S.C. § 1401 does not require proof of a 'biological relationship' between the child born abroad to married U.S. citizen parents"); *Dvash-Banks v. Pompeo*, 2019 WL 911799, at *7 (C.D. Cal. Feb. 21, 2019) ("Nothing in Section 301 . . . suggests that in using the words 'parent' or 'born . . . of parents,' Congress intended to refer only to biological or genetic parents").

[20] Defendants cite *Colaianni v. I.N.S.*, 490 F.3d 185, 187 (2d Cir. 2007). But the one-paragraph discussion in that case is conclusory and unclear. The Second Circuit has since held, without even citing *Colaianni*, that Section 301 does not require a biological relationship.  *See Jaen*, 899 F.3d at 190.

## 4.    Defendants' Arguments

Defendants advance several arguments in support of their position that Section 301(c) requires a biological parent-child relationship.  None foreclose the Non-Biological Reading.

First, Defendants claim their construction is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  But constitutional avoidance trumps *Skidmore* deference.  *See Miller v. Johnson*, 515 U.S. 900, 923 (1995) ("[W]e have rejected agency interpretations to which we would otherwise defer where they raise serious constitutional questions."); *Edward J. DeBartolo*, 485 U.S. at 574–75 (although an agency's "statutory interpretation . . . would normally be entitled to deference," courts cannot defer to that interpretation if it "would raise serious constitutional problems"); *Lowe v. S.E.C.*, 472 U.S. 181, 216 (1985) (White, J., concurring) (*Skidmore* deference "cannot be decisive" if constitutional avoidance applies); *Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 893 (8th Cir. 2013) ("Constitutional avoidance trumps even *Chevron* deference, and easily outweighs any lesser form of deference we might ordinarily afford an administrative agency.").

46

Defendants next claim they have always interpreted Section 301 to require a biological relationship and that Congress necessarily approved that interpretation when it amended the INA without specifying that a biological relationship is *not* required.  This is an invocation of the re-enactment doctrine, which holds that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  But "the State Department has cited no authority for the application of this principle, typically applied to agency interpretations contained in promulgated regulations subject to notice and comment, to an internal policy manual such as the FAM." *Kiviti*, 2020 WL 3268221, at *11.  And, even if it had, the doctrine "is merely an interpretive tool fashioned by the courts for their own use in construing an ambiguous legislation." *Bell Fed. Sav. & Loan Ass'n v. Comm'r*, 40 F.3d 224, 230 (7th Cir. 1994); *see Helvering v. Reynolds*, 313 U.S. 428, 432 (1941) (the doctrine "is no more than an aid in statutory construction," which is "useful at times").  It must yield to the "cardinal principle" of constitutional avoidance, which is likewise triggered by statutory ambiguity.  *Jennings*, 138 S. Ct. at 842.

The re-enactment doctrine also applies "only where an agency's statutory construction has been fully brought to the attention of the public and the Congress." *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1335 (11th Cir. 2005). Here, "there is nothing to indicate that Congress was aware of [the State Department's interpretation] when it subsequently amended and re-enacted [the INA]." *Id.*; *see Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955) ("Re-enactment— particularly without the slightest affirmative indication that Congress ever had the [agency's interpretation] before it—is an unreliable indicium at best."). There is not even any evidence (beyond Defendants' own conclusory assertion) that the State Department's interpretation predates 1994, the year in which Section 301 was last amended. Pub. L. No. 103-416, § 101, 108 Stat. 4305; *see Kiviti*, 2020 WL 3268221, at *11 (finding "no evidence that the specific statutory interpretation at issue here even predates 1986"). Even if the re-enactment doctrine did apply here, its limited weight would not tip the scales conclusively in favor of the Biological Reading. *See Winter v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1449 n.12 (11th Cir. 1985) ("Courts ordinarily do not attach much

significance to Congress' acquiescence in an agency's interpretation of a statute because non-action by Congress is not often a useful guide.").

Third, Defendants say "the traditional understanding of *jus sanguinis* citizenship provides a strong reason to pause before" adopting the Non-Biological Reading. (Dkt. 32-1 at 21.) *Jus sanguinis*, which literally means "right of blood," is a "Roman Civil Law concept" that says "a child's citizenship is determined by the parents' citizenship." *Sabra*, 2020 WL 1643676, at *19; Black's Law Dictionary (11th ed. 2019) ("jus sanguinis").  But Defendants ignore the fact that there are different "versions of jus sanguinis" whose "basic rule[s] can vary in strength." Matthew Lister, Citizenship, in the Immigration Context, 70 Md. L. Rev. 175, 198 (2010).

To the extent Defendants invoke a version of *jus sanguinis* that literally depends on blood, they "identif[y] no place in the Constitution, the INA, or another federal statute where that principle has been explicitly adopted by the United States."  *Kiviti*, 2020 WL 3268221, at *12.  Importantly, "[t]here is not, and never was, any such common-law principle." *United States v. Wong Kim Ark*, 169 U.S. 649, 670 (1898).  To the contrary, U.S. citizenship "traditionally has not been limited to

49

biological parents but has included others, such as those who became parents at birth through marriage." *Kiviti*, 2020 WL 3268221, at *12; *see* Kerry Abrams & R. Kent Piacenti, Immigration's Family Values, 100 Va. L. Rev. 629, 658 (2014) ("[C]itizenship sometimes passed from U.S. citizen fathers to foreign-born marital children to whom they were not biologically related. . . . [I]t was marriage rather than blood that was doing the work.").[21]

Finally, Defendants point to two cases in which the Supreme Court said that "ensuring reliable proof of a biological relationship between the potential citizen and its citizen parent is an important governmental objective." *Miller*, 523 U.S. at 436 (Stevens, J.); *see Nguyen*, 533 U.S. at 62. But both cases involved children with unmarried parents who challenged the constitutionality of INA Section 309 — the "born out of wedlock" provision that explicitly requires a "blood relationship." Neither Section 301 nor marital children were at issue in either case. As

---

[21] Defendants' reliance on *jus sanguinis* is also in tension with their position that a non-genetic gestational relationship is sufficient to transmit citizenship.

a result, the cases do not foreclose a Non-Biological Reading of Section 301(c).[22]

### 5.    Conclusion

The Court finds that Section 301(c) is reasonably consistent with the Non-Biological Reading, even if it is also consistent with the Biological Reading.   Because the Non-Biological Reading is "fairly possible," and because the Biological Reading would raise serious constitutional questions, the Court must adopt the former under the doctrine of constitutional avoidance.   *See Zadvydas*, 533 U.S. at 689 ("We have read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation.").

---

[22] According to the FAM, Defendants' policy of reading a biological relationship requirement into Section 301 is based in part on the theory that (1) Section 309 explicitly applies to children "born out of wedlock"; (2) Section 301 is thus limited to children born in wedlock; and (3) the only parents whose marital status matters for the wedlock determination are the *biological* parents.   But Defendants never pressed this argument in their papers or at oral argument.   Even if they had, the phrase "born out of wedlock" is not unambiguously limited to children whose biological parents were unmarried at the time of their birth.   *See Scales*, 232 F.3d at 1164 (a child is not "born out of wedlock" if "he was born to parents who were married at the time of his birth," even if he lacks a biological relationship with both parents).   In ordinary speech, for example, one would not say a child born through ART to married parents was "born out of wedlock," even if the child shared a genetic relationship with only one parent.

**D.    Conclusion**

Having adopted the Non-Biological Reading, the Court finds that Section 301(c) does not require children to share a biological relationship with both citizen parents in order for those children to acquire citizenship at birth.  As a result, S.M.-G. is a U.S. citizen under Section 301(c), she is entitled to a U.S. passport, and Plaintiffs' constitutional claims (Counts 2–3) are moot.  (*See* Dkt. 61 at 30, 55–56, 58–59 (noting that the Court need not address Counts 2–3 if it grants Plaintiffs' summary judgment motion on Count 1).)  The Court thus (1) denies Defendants' motion to dismiss Counts 1–3; (2) grants Plaintiffs' motion for summary judgment on Count 1; (3) denies Defendants' cross-motion for summary judgment on Count 1; and (4) dismisses Counts 2–3 as moot.

Plaintiffs' only remaining claim is Count 4 (their APA claim), which Defendants also move to dismiss.  The Court turns to that claim now.

**V.    Plaintiffs' APA Claim (Count 4)**

Count 4 claims that Defendants' invocation of the Biological Reading to deny S.M.-G.'s applications "is arbitrary, lacks a rational basis, and is contrary to law."  (Dkt. 7 ¶¶ 96–97.)  Plaintiffs say this entitles them to relief under the APA.  The Court disagrees.

The APA provides judicial review for "[a] person suffering legal wrong because of agency action." 5 U.S.C. § 702. But review is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. That is so because "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). In other words, the APA "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures" under another statute. *Id.* These alternative procedures "need not provide an identical review that the APA would provide." *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018). They need only "offer[] the same genre of relief." *Id.*

8 U.S.C. § 1503 provides an adequate alternative remedy here. It creates a legal right of action for "any person who is within the United States [who] claims a right or privilege as a national of the United States and is denied such right or privilege . . . upon the ground that he is not a national of the United States." 8 U.S.C. § 1503(a). The provision states expressly that the aggrieved person may "institute an action . . . for a judgment declaring him to be a national of the United States." *Id.* This

remedy is designed to address exactly the kind of wrong alleged by Plaintiffs here, namely, "the U.S. Embassy's erroneous finding that S.M.-G. is not a U.S. citizen and its related decision to deny the CRBA and passport applications submitted on S.M.-G.'s behalf."  (Dkt. 7 ¶ 92.)

Indeed, the adequacy of the remedy is illustrated by the fact that Plaintiffs actually invoked it in this case; they used it to bring, and ultimately prevail on, Count 1 of their complaint.  *See Heslop v. Attorney Gen. of U.S.*, 594 F. App'x 580, 584 (11th Cir. 2014) (INA provision offered adequate alternative to APA review where plaintiff "brought his INA claim under that very provision").  "[W]hen plaintiffs challenge the State Department's 'deprivation of U.S. passports on the allegedly erroneous conclusion that they are not citizens,' courts have consistently concluded that § 1503(a) provides 'an adequate alternative remedy' to APA review." *Kiviti*, 2020 WL 3268221, at *14 (quoting *Hinojosa*, 896 F.3d at 312); *see Heslop*, 594 F. App'x at 584 ("The APA does not authorize judicial review that adds to the sweeping *de novo* review that the INA provides.").

Plaintiffs counter that Section 1503(a) is inadequate here because, although it allows them to obtain a declaration of citizenship, they seek additional relief that it cannot provide.  (Dkt. 35-1 at 25.)  This additional

relief is two-fold: (1) a declaration condemning Defendants' "policy and practice" towards the children of married same-sex couples, and (2) a permanent injunction enjoining Defendants from continuing to apply that policy and practice. (Dkts. 7 at 32; 35-1 at 25.)  But Plaintiffs cannot obtain this relief under the APA either.  Plaintiffs' requests essentially seek "wholesale improvement of a program by court decree" — something the APA forbids.  *Dvash-Banks*, 2019 WL 911799, at *6 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). Moreover, "the injunction sought by Plaintiffs is well beyond that needed to provide Plaintiffs with complete relief, namely a declaration that [S.M.-G.] is a U.S. citizen."  *Id.*  If the Court issued the sweeping injunction sought by Plaintiffs, it would violate the rule that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see Kiviti*, 2020 WL 3268221, at *15.

Because Plaintiffs have an adequate alternative remedy to APA review, the Court grants Defendants' motion to dismiss Count 4.

## VI.   Conclusion

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 63) is **DENIED**.  Defendants' Motion to Dismiss the Complaint (Dkt. 32) is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** to the extent it seeks dismissal of Count 4.  It is otherwise **DENIED**.  Plaintiffs' Motion for Partial Summary Judgment (Dkt. 44) is **GRANTED**, and Defendants' Cross-Motion for Partial Summary Judgment (Dkt. 50) is **DENIED**.

The Clerk is **DIRECTED** to enter summary judgment for Plaintiff S.M.-G. on Count 1; Counts 2–3 are **DISMISSED AS MOOT**; and Count 4 is **DISMISSED** for failure to state a claim.  The Court **DECLARES** that S.M.-G. is a United States citizen by birth pursuant to 8 U.S.C. § 1401(c).  The Court **DIRECTS** Defendants to issue a United States passport to S.M.-G.

**SO ORDERED** this 27th day of August, 2020.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE